483 So.2d 254 (1985)
BANKERS LIFE AND CASUALTY COMPANY
v.
Lloyd M. CRENSHAW.
No. 54123.
Supreme Court of Mississippi.
September 11, 1985.
Rehearing Denied February 26, 1986.
*256 George F. Woodliff, Charles G. Copeland, Heidelberg, Woodliff & Franks, Jackson, John M. Kinard, Michael J. McElhaney, Megehee, Brown, Williams & Mestayer, Pascagoula, for appellant.
Ernest R. Schroeder, Vincent J. Castigliola, Jr., John A. Banahan, Bryan, Nelson, Allen, Schroeder & Backstrom, Pascagoula, for appellee.
EN BANC.
Bankers Life and Casualty Company (Bankers Life) is a health and accident insurance corporation with principal offices in Chicago, Illinois. Lloyd M. Crenshaw is a resident of Pascagoula. Bankers Life appeals from a jury verdict and judgment of the Jackson County Circuit Court in favor of Crenshaw of $20,000 actual and $1,600,000 punitive damages, arising out of a claim for accidental loss of a lower right leg, alleged to be covered under a Bankers Life group insurance policy Crenshaw had through his employer, White Stores in Pascagoula, a subsidiary of City Products Corporation.
The main issues of this appeal are whether the question of punitive damages should have been submitted to the jury, and the propriety of the amount awarded.
We find the issue of punitive damages was properly submitted to the jury. A majority of the Court is of the opinion that the judgment of the lower court should be affirmed in its entirety.
HAWKINS, Justice, for the Court, Part I:

FACTS
On January 18, 1979, Crenshaw's right leg was amputated about six inches below the knee by surgeons at Keesler Air Force Base Hospital. At the time he was 61 years old. Previous to that date Crenshaw had injured his right foot; however, there is some discrepancy in the record as to the precise date of the injury and nature of the trauma. We will give both Crenshaw's version and the history set out in the medical records.
January 6, 1979, was a Saturday. That evening he was working on his car's alternator when part of it rolled off his work bench and struck the front part of his right foot, just below where his shoelaces would have been had he been wearing shoes. Instead, he only had on socks and house slippers. He replaced the alternator on the car.
When he removed his house slippers, his foot was red and bruised, but not swollen. The skin was not broken. That night he took some aspirin.
The next day, Sunday, January 7, Crenshaw noticed that his foot had swollen during the night. He hobbled around the house that day, soaked his foot in warm water, and rested on his couch.
On Monday afternoon, January 8, Steven Crenshaw, an adult son living with his parents, drove Crenshaw to the Keesler base hospital, where he was seen in the emergency room. He was given medications and told to stay off his foot as much as possible.
Crenshaw testified he returned to the hospital, but did not state whether it was the next day or two days following. On this trip he said his foot was x-rayed and he was given a blood test. A splint was put on his leg and he was given crutches. On this trip he was told to keep his foot elevated. *257 Crenshaw testified when he elevated his foot that this eased the pain.
He made another trip to the emergency room when he was again checked, and released home. He returned Friday, January 12, at which time the wrapping was removed and he was again sent home.
The following day Crenshaw's foot was swelled again and had turned dark. On Sunday, January 14, his wife drove him back to the hospital, at which time he was admitted. Different Air Force physicians examined Crenshaw on his previous trips to the hospital.
During the week he was at home following his second visit to the hospital, Crenshaw stayed in bed, and in the day was not in great pain. At night, however, the pain increased and he could not sleep. When he first elevated his foot it hurt worse, but the pain would eventually ease. He characterized the injury to his foot as a bruise, with the pain so great he could not walk on it. Medication helped to ease the pain.
Mrs. Crenshaw saw her husband's foot the night of his injury. She said it was red and bruised looking, but the skin was not broken. She testified that the next day it started swelling and getting bluish-red looking.
Steven Crenshaw said the night his father injured his foot there was swelling, but that a "little black bruise on top of his foot" did not show up until the next day.

HOSPITAL RECORDS
The first medical record of this injury is a January 9, 1979 (Tuesday), emergency room report. That report states:
61 year old white male complaining of pain in right foot. Patient was driving auto and hit pole with foot on brake yesterday. Unable to stand on foot. Patient soaked foot in hot water last nite. Chief complaint: tingling across dorsum (top) toes of right foot, acutely tender at great right toe.
O: swollen, tender right midfoot, especially base right first metatarsal (great toe).[1]
Dorsalis pedis palpable (an artery in the foot, a continuation of the anterior tibial).
This January 9 report shows the x-ray negative, and the urinalysis (for possibility of gout) as normal.
Crenshaw was diagnosed as having a "ligamentous injury metatarsal right foot". There is also a notation that the examiner discussed the case with Dr. Morrow, an orthopedist, and after consultation, a splint was applied, and Crenshaw was given analgesics for pain. He was given crutches, told not to bear weight on his foot, and told to return in a week to see an orthopedist. The examining physician was Dr. Thomas E. Scott, a resident.
There is also a sheet headed "CLINICAL RECORD  CONSULTATION SHEET", which apparently is a request for consultation with the orthopedist. It is dated January 9. Under the sub-heading "Reason for Request" is the following handwritten notation: "61 year old white male struck on ball right foot with rebounding clutch. X-rays no fractures or dislocation. Please follow up ligament injury mid-foot." The provisional diagnosis is: "ligament injury 1st metatarsal-tarsal joint." This sheet is also signed by Dr. Scott, and the requested orthopedist is Dr. Morrow.
He was next seen January 11, with this notation: "Patient returned out of pain meds, was given 30 percodans 9Jan79." Dr. Scott, the physician on January 11, was concerned that Crenshaw might be taking too much pain medication. Dr. Scott told Crenshaw to return to the orthopedist as planned.
The records show Crenshaw was seen on January 12 by Dr. Henry J. O'Neal, an internal medicine intern. Crenshaw presented himself as being out of pain medication. He also complained that he was not obtaining relief from the medication. *258 There were no diagnostic tests run on either the January 11th or 12th visits.
The records show Crenshaw returned on January 14th and was again seen by Dr. O'Neal. Noted were swelling and red streaks progressing up the lower extremity, the foot swollen, and toes blue. A blister was noted on the back of his foot. The pulses were not palpable. There was a decreased sensation to pinprick of his extremity. There was also a mild enlargement of lymph nodes in the groin. X-rays to determine gangrene showed no gas in the soft tissues of the affected extremity. The red blood cell count was normal. The white blood cells were elevated to 13,300, being above the upper limit normal of 10,000. Dr. O'Neal's impression was a superficial infection with swelling and decreased vascular flow.
Dr. O'Neal noted the need for a surgery consultation, and Crenshaw's condition was recognized as being serious enough for him to be admitted to the hospital.
Dr. Dan L. Locker, chief resident on vascular surgery, examined Crenshaw, and his report that day recites the following:
Ext. (external)  RLE (right lower extremity)  pitting edema from knee distal
Pop (popliteal) doppler  strong
PT (posterier tibial)  present 2 cm above mallelous  weak monophasic
DP (dorsalis pedis)  present 2 cm above ankle line  weak monophasic
Perineal  present  biphasic at ankle line Foot is pale  white with mottling Vth toe purple  distal half
Sensation decreased distal to MT-P (metatarsal  phalingeal) line
A (diagnosis)  Cynasis 2° (secondary) to swelling over 12 hr. duration confine to distal extremity (beyond ankle line).
P (recommend) (1) Elevate
(2) Anticoagulate with Heparin
Pt Ed (Patient Education) Pt (patient) informed of options and hi prob (high probability) of loss of part of foot
Staff  Pt. presented to Dr. Fontenelle who examined patient and agrees with plans.
Dr. Torma also notified.
Crenshaw was seen by Dr. Christopher T. Westphal, an Air Force general surgeon on January 17, 1979, who performed a surgical amputation on the following day. He was assisted by Dr. Dale V. Hoekstra, a Board certified orthopedist.
Dr. Westphal's operation report, dated January 23, in pertinent part states the following:
PREOPERATIVE DIAGNOSIS
Vascular insult, right foot
* * * * * *
OPERATIVE DIANOSES
Same
* * * * * *
FINDINGS:

The patient was found to have an ischemic right foot with a necrosis of the distal aspect. This was amputated in the manner about to be described. [Emphasis added]
PROCEDURE:
The patient was administered epidural anethesia. His right lower extremity was prepped and draped in a sterile manner. A tourniquet was applied with 450 mm. of mercury with a total tourniquet time of 14 minutes. A fish-mouth apex of the incision approximately 6" below the tibia plateau. The anterior and posterior vessels were identified and ligated. Similarly, the peroneal vessels were identified and ligated with 2-0 silk suture material. The greater and lesser saphenous veins were also identified and ligated. The remainder of hemostasis was assured with electrocautery. At the time of operation, the stump was noted to be extremely ischemic and the muscles somewhat dusky looking with a little free bleeding at the time of operation. The posterior tibial nerve was grasped, cut and allowed to retract. The periosteum of the tibia was incised and elevated. The tibia was divided with a saw. Similarly, the fibula was divided approximately 1" shorter than the tibia . .. A Penrose drain was inserted in *259 the base of the wound with the ends of the drain coming out of the incision bilaterally.
S/DALE V. HOEKSTRA, MAJ, USAF MC
The January 22 pathology report of the stump, notes: "Vasculature is unremarkable. The skin is mottled up to 5 cm. above the digits." It concludes as follows:

(A) RIGHT FOOT AND LOWER LEG: SEVERE ARTERIOSCLEROSIS OF THE ARTERIES. GANGRENOUS NECROSIS
Dr. James P. Durning, Resident in Surgery, prepared the Narrative Summary of Crenshaw's problems on February 2, also signed by Dr. Locker. The pertinent portions of this summary read as follows:
DATE:
14 January 79
HISTORY OF PRESENT ILLNESS:
Lloyd Crenshaw is a 61 year old white male who presented to the emergency room at Keesler Medical Center on 14 Jan 79 with a complaint of pain in his right foot. The patient was one week status post injury to his right ankle in an auto accident. The patient had been previously seen in the emergency room and was told to remain off his leg and keep it elevated. The patient failed to do this at home, and came in complaining of right foot pain. On presentation to the emergency room, the foot was noted to be painful, bluish-white, cool to exam, with absent distal pulses. The patient was admitted, placed on Heparin therapy, and the foot was elevated.
PAST HISTORY:
The review of systems was essentially unremarkable. The patient has no history of pulmonary, cardiac or bowel disease. His chief complaint was as noted above. Past medical history was also unremarkable. Past surgical history was remarkable for an appendectomy in 1951 and lysis of adhesions in 1977. Family history was non-contributory. The patient is a heavy tobacco user. He uses occasional alcohol. He was on no medications at the time of admission.

CLINICAL FINDINGS ON ADMISSION:
Clinical findings on admission indicated a well developed, well nourished white male. HEENT were unremarkable. Pulmonary examination revealed good breath sounds bilaterally without any rales or rubs. Cardiac exam was unremarkable. No murmurs were heard. Abdominal exam was also within normal limits with a soft, nontender abdomen and a long midline surgical scar. Examination of the extremities was remarkable for a blue and cold, paresthetic right foot. There were no auscultable pulses in the foot. Necrosis of the distal toes was also noted.

* * * * * *
X-RAY STUDIES:
Chest x-ray was unremarkable. X-ray of the right lower extremity did not reveal any gas indicative of gas gangrene.
PROGRESS IN HOSPITAL:
The patient was admitted and placed on strict bedrest with elevation of the right leg. He was also placed on Heparin therapy at the time with constant monitoring of PT and PTT. Despite adequate heparinization, the foot failed to resolve. On 18 Jan 79, the patient was transferred to the Surgery A Service and underwent a right below the knee amputation. Amputation was performed under the direction of Dr. Locker and Dr. Hoekstra of the Orthopedic Department. Postoperatively, the patient did well. The stump has been healing well.
* * * * * *
FINAL DIAGNOSIS:
1. Anterior compartment syndrome, right leg.

2. Ischemia of right leg. [Emphasis added]
*260 On April 9, 1979, Crenshaw filled out a proof of claim on the Bankers Life form, with a medical authorization for the insurance company to obtain all medical information it needed from any physician or hospital. No physician's statement was executed on behalf of Crenshaw because of an Air Force regulation. Bankers Life was notified of this regulation, and also informed that the Air Force would reproduce photocopies of all medical records and send these. The narrative summary, Dr. Westphal's operation report, and the pathology report were sent to Bankers Life when Crenshaw made his claim.
Bankers Life employed Equifax, Inc., an investigating agency, to investigate the claim. The agency interviewed Steven Frye, manager of the local store and also one of Crenshaw's neighbors, but did not obtain any medical records. Its report dated April 24, 1979, concluded:
SUMMARY/SUGGESTION: We do suggest that you allow us to diary this case for some six weeks and go back into the area to interview Mr. Crenshaw. He is at the hospital five days per week, comes home on week-ends, and will be there an additional 5-6 weeks.
Equifax was not requested to perform any further services for Bankers Life following this report.
William J. Herzau was supervisor of the Special Risks Claim Unit of Bankers Life. In this department William A. Blessing and Robert N. Krol reviewed Crenshaw's claim along with Herzau.
Dr. Nathaniel P. McParland[2] is a physician, specializing in general and vascular surgery, and also a salaried employee of Bankers Life as Medical Director. His responsibility was to make medical judgments on claims, a job which constituted one-fifth of his practice.
Donald Lemersal was one of seven full-time attorneys constituting the legal department.
These individuals participated in the decision making process of Crenshaw's claim.
On June 19, 1979, Herzau sent Dr. McParland a memo explaining the final diagnosis, Banker's Life position and requesting an evaluation.
Dr. McParland replied by memo to Herzau the same date.
TO: William Herzau
FROM: N.P. McParland, M.D.
* * * * * *
Mr. Crenshaw's records have been reviewed. Noted is the absence of the record of the original injury. However, Mr. Crenshaw's loss of limb was not because of an anterior compartment syndrome, but because of severe arteriosclerotic changes in his distal blood vessels and subsequent ischemia and necrosis. The operative report indicates the obstructing arteriosclerotic area most likely is in the femoro popliteal artery area though no mention of the femoral or popliteal pulses is noted.
Mr. Crenshaw will most likely require further amputative surgery.[3]
On July 11, 1979, Herzau wrote Mrs. Marilyn Doyle, Administrator of Employee Benefits of City Products Corporation, Crenshaw's employer:
We now have the facts needed to service your claim.

*261 The above captioned policy is an accident only policy defining injury as:
"Injury wherever used in this policy means bodily injury causing the loss while this policy is in force, directly and independently of all other causes and effected solely through an accidental bodily injury to the insured person."
According to the medical information we have, it appears that Mr. Crenshaw's limb loss was because of severe arteriosclerotic changes in his distal blood vessels and subsequent ischemia and necrosis and not due to an injury as defined above. Therefore, we cannot identify that a covered loss has occurred under the terms and interpretations of the policy. [Emphasis added]
So, we sincerely regret that no benefits are payable.
If we have in any way misinterpreted the information furnished us, or if there is additional information we should have, please let me know.
On July 10, 1979, the case reserve was reduced from $20,000 to $3,000.
On September 25, 1979, Harzau's denial was communicated to Crenshaw in a letter from Leon Mueller of White Stores, a subsidiary of City Products Corporation.
Thereafter, Crenshaw obtained the following statement dated October 5, 1979, from the Air Force:
1. Mr. Lloyd Crenshaw was hospitalized in late January 1979 where he underwent a below-the-knee amputation of the right leg. From a thorough review of his records dating back to 1972, I am unable to find any evidence of symptomatic atherosclerotic disease in his right lower extremity prior to the injury which ultimately caused him to undergo a right below-the-knee amputation. When seen in the Emergency Room initially for this injury, a dorsalis pedis pulse was palpable and documentation of this is substantiated in the records. This documentation was noted on 9 Jan 1979. Following the initial injury he developed a gangrenous right foot. He was admitted and a trial of heparinization and elevation in order to save the lower extemity was undertaken. This was not successful and as a result a below-the-knee amputation was performed. The specimen was submitted to pathology for diagnosis. At that time it was apparent to the pathologist that he had severe atherosclerosis of the arteries of the lower extremity.
2. I would feel that the atherosclerosis is an underlying condition and not the immediate cause of the gangrenous necrosis. The precipating event must be considered to be the trauma which intially brought him to the Emergency Room on 9 January.
This statement is signed by Dr. Dale V. Hoekstra, the orthopedist attending the surgery; Dr. Robert L. Morrow, chairman of the Department of Orthopedic Surgery; and Dr. Thomas T. Coolidge, Director of Hospital Services.
In answer to a letter from Mrs. Doyle stating Crenshaw wished to appeal his claim, Herzau replied on December 4, 1979, repeating Bankers Life's position as previously set out, stating in pertinent part:
In order to reconsider this claim, we would need additional medical information showing that Mr. Crenshaw's loss was due to an accidental bodily injury directly and independently of all other causes. [Emphasis added]
An interoffice memo from Blessing to McParland dated March 27, 1980, notes the receipt of the correspondence from the three doctors dated October 5, 1979, and attaches it to the memo:
Mr. Crenshaw underwent a right below knee amputation on January 18, 1979 after reportedly sustaining an injury to the leg on January 6, 1979.
This claim was previously denied on the basis that the amputation was caused by vascular conditions rather than an injury.
Mr. Crenshaw has advised that he would like to appeal this decision. He has furnished us with the attached medical report from the Department of the Air Force.

*262 I see nothing in the report which would change our decision on this case. However, we would appreciate it if you would review the file once again paying particular attention to this new information. [Emphasis added]
Do you still feel that Mr. Crenshaw's limb loss was due to his vascular problem rather than his January 6, 1979 injury? Also, do you feel there is any additional information which would be helpful in making a determination? If so, what?
Dr. McParland's memo to Blessing dated April 2, 1980, states:
The records again have been reviewed. Again noted is the admitting examination of this heavy smoker with a cold, pale, paresthetic, right foot with absent distal pulses. An anterior compartment syndrome would affect only the anterior tibial artery and dorsal pedal pulse. The posterior tibial artery is the major artery to the foot and this too was occluded producing the physical findings and the resultant amputation of the lower extremity. This was confirmed in the pathology report and, therefore I feel no further information is necessary to sustain our previous diagnosis. [Emphasis added]
If I can be of further help, please call.
On April 8, 1980, Herzau wrote Crenshaw, stating:
Our medical director has once again reviewed your file.
this policy is an accident only policy defining injury as:
"Injury wherever used in this policy means bodily injury causing the loss while this policy is in force, directly and independently of all other causes and effected solely though an accidental bodily injury to the insured person."
According to all the medical information we have, it appears your limb loss was due to severe arteriosclerotic changes in the distal blood vessels and subsequent ischemia and necrosis and not due to any injury as defined above. This opinion was confirmed in the pathology report. Therefore, we cannot identify that a covered loss has occurred under the terms and interpretations of the policy. [Emphasis added]
Crenshaw then employed an attorney, who wrote Herzau on May 15, 1980, demanding payment, and stating that Crenshaw's trauma was a precipitating event to his trouble, as revealed by the medical records.
Herzau wrote Lemersal a memo on May 16, 1980, asking him to review the file, stating Crenshaw's lawyer had furnished no new information, and only an "opinion" that Crenshaw's condition came within the terms of the policy.
Lemersal replied to Herzau by memo dated June 19, 1980:
I do not feel there is a legal question presented here at this time. Until we know more about the condition and how (and whether) the alleged accident contributed to cause the loss we cannot very well apply the Mississippi law regarding proximate cause.
If an injury caused the loss we should have some further substantiation of this. I suggest that in writing to Attorney Schroeder you explain in some detail what our file contains and point out to him that we must have some substantiation that an injury caused this loss "directly and independently of all other causes."

Perhaps we should try to get more information on etiology, previous treatment, etc. The report from the VA hospital indicates there may not have been treatment before January 14, 1979.

If there is further substantiation that the loss is the result of the combination of disease and accident Mississippi law holds that where "injury aggravates, renders active, or set in motion a latent or dormant pre-existing physical condition or disease ..." there may be recovery under this type policy. Peerless Insurance Company v. Myers, 192 So.2d 437 (1966, Miss.Sup.Ct.). However, we *263 do not know what effect the alleged injury had on this condition, or whether the arteriosclerotic changes were dormant. [Emphasis added]
On July 15 Crenshaw's attorney responded with a strong letter, again requesting payment, explaining the position of Crenshaw that the trauma contributed to the problem causing the amputation. He quoted from the three physicians letter of October 5, 1979:
I would feel that the atherosclerosis is an underlying condition and not the immediate cause of the gangrenous necrosis. The precipitating event must be considered to be the trauma which initially brought him (Crenshaw) to the Emergency Room on 9 January.
This letter again stated if the company wished to dispose of this case without litigation, to please forward payment.
A memo from Blessing to Herzau on July 23 states:
Dr. McParland feels this limb loss is due to pre-existing vascular problem. However, it appears there is some evidence his physical condition deteriorated rapidly after this event. Per Don Lemersal, Mississippi law holds that where "injury aggravates, renders active, or set in motion a latent or dormant pre-existing physical condition or disease..." there may be recovery under this type policy. In view of attorney Schroeder's letter of 5-15-80, I suggest we consider the possibility of a compromise. [Emphasis added]
On June 27 Herzau wrote Crenshaw's attorney, again denying coverage on the ground that there was no evidence that Crenshaw's alleged "injury caused this loss `directly and independently of all other causes.'" Herzau also explained that it was the view of Bankers Life's medical director that:
The operative report indicates the obstructing arteriosclerotic area most likely is in the femoro popliteal artery area although no mention of the femoral or popliteal pulses is noted. [Emphasis added]
Blessing wrote a memo to Lemersal on July 28:
This 63 year old auto parts manager is claiming limb loss due to a January 6, 1979 injury to his right foot. A car part fell on his foot reportedly resulting in a below knee amputation on January 18, 1979.
Dr. McParland has reviewed this file twice and feels that this limb loss is due to a pre-existing vascular condition. However, there is some evidence that his physical condition deteriorated after this trauma.
You previously advised us that Mississippi Law holds that where "injury aggravates, renders active, or sets in motion a latent or dormant pre-existing physical condition or disease ..." there maybe recovery under this type policy.
Please see Attorney Schroeder's letter of July 15, 1980. This letter contains no additional factual information regarding Mr. Crenshaw's medical problems. Rather, it contains Mr. Schroeder's interpretation of the previously submitted medical information. Since Mississippi is a penalty state, I request that you review this file and respond to Attorney Schroeder's letter.
If you prefer, please advise what type of response we should give and I will write Attorney Schroeder.
Lemersal in turn contacted Dr. McParland, who wrote the following memo to Lemersal dated August 7:
The records have been reviewed again. Noted is the absence of an emergency room report on the alleged injury which has been described on the discharge summary as a jarring injury to the right leg. On the narrative summary the patient gave a history of injury to his right ankle in an auto accident for which he was seen and advised in an emergency room. Mr. Crenshaw states he dropped an armature onto his right foot.
His physical findings were that of complete arterial occlusion to foot and lower *264 leg with necrosis of the distal tips of the toes.
This severe occlusive arterial disease in this heavy smoker necessitated an amputation six inches below the knee, and the pathology report indicated severe arteriosclerosis indicative of relatively long standing disease.
A diagnosis of anterior compartment syndrome and ischemia of the leg was the final diagnosis.
If Mr. Crenshaw had an anterior compartment syndrome, which he did not, malpractice is in evidence because the treatment is division of the fascia enclosing the musculature not leg amputation.[4] If Mr. Crenshaw in reality did to his leg, foot or ankle depending upon which report is read, he either had no evidence of any injury, and therefore was sent home from the emergency room, or if there was injury again malpractice is in evidence because of lack of treatment in a severely diseased foot from atherosclerosis and the absence of any pulses. The treatment of choice being immediate hospitalization and heparin therapy.

Because of the absence of an emergency room report, I must conclude there was either no trauma or the trauma was insignificant.
Mr. Crenshaw suffered from severe occlusive arteriosclerosis of all arteries at least as high up as six inches below his knee, resulting in ischemia and gangreene [sic] of his foot.
* * * * * *
In conclusion, Mr. Crenshaw has a very common disease for which various therapies are instituted in virtually every hospital in the country. No trauma is necessary to produce the end results suffered by Mr. Crenshaw and from the reports presented, I feel the alleged trauma has not been documented, and even if all three areas were traumatized at one time, there would be no cause and effect situation.
If Mr. Crenshaw had any significant trauma or an anterior compartment syndrome malpractice was performed. [Emphasis added]
Lemersal wrote to Blessing on August 8: Please see the memo from Dr. McParland dated August 7.
I do not feel a legal question is involved. The question is whether the amputation was caused by an accident, as required by the policy. I do not believe there is anything I can add to my memo dated June 19, 1980. [Emphasis added]
Incidentally, I am not aware Mississippi is a "penalty state."
Herzau wrote Crenshaw's attorney on August 18, 1980, summarizing Dr. McParland's evaluation, including the absence of an Emergency Room report, and concluding:
In conclusion, Mr. Crenshaw has a very common disease for which various therapies are instituted. No trauma is necessary to produce the end results suffered by Mr. Crenshaw. Even if all three areas of the leg were traumatized at once, there would be no cause and effect situation.
So, we sincerely regret that the policy does not permit payment of benefits.
Crenshaw instituted suit November 10, 1980, for $20,000 actual damages and $400,000 punitive. The declaration was later amended to claim $1,635,000 in punitive damages.
At trial in December, 1981, three physicians testified: Dr. Perry J. Hockaday and Dr. Westphal, who testified for Crenshaw; and Dr. McParland, who testified for Bankers Life. Neither Dr. Hockaday nor Dr. McParland had treated or examined Crenshaw.

DR. HOCKADAY
Dr. Hockaday is a general surgeon who had been practicing 15 years in Pascagoula. *265 Prior to this he was a surgeon in the Air Force. In answer to a hypothetical question, he testified that the amputation was a result of injury. The precipitating cause in his opinion was trauma, probably combined with arteriosclerosis of a severe nature. He testified that one of the common causes of people who have loss of limbs with arteriosclerosis was accidental trauma. The trauma did not have to be severe. He explained that the patient would have an inability to heal the wound by virtue of poor blood flow to the extremities. Further, a person with poor blood flow such as Crenshaw was more susceptible to severe complications from minor injuries because any swelling would result in a further decreased blood flow to an area already experiencing poor circulation.
In making a determination of whether there was an arterial occlusion independent of any trauma or whether trauma played some part in the problem, Dr. Hockaday testified the entire medical record needed to be examined, not just portions of it as seen by Dr. McParland. Of utmost importance to Dr. Hockaday was the emergency room report, which documented an injury of some type to Crenshaw, distinguishing him from someone who simply came in off the street with a need to have his leg amputated.
Dr. Hockaday testified (Record, P. 670): We're dealing with swelling, and swelling is the culprit. We're talking about a long-standing disease that has evolved over 61 years and a gradual diminished flow .. . a flow that has not diminished to the point of creating a problem by itself solely, but with that little bit that tips it over  and that is the swelling of the foot and the shutdown of the circulation in the toes... . And that's where usually gangrene of this nature starts, in the toes, rather than a diffuse problem.
He was of the opinion that the dark, dusky muscle and tissue observed by the pathologist could have been caused by the tourniquet used during surgery.
He stated that a person with arteriosclerosis who sustains an injury presents a very hard problem to the doctor, who hopes the patient will have enough circulation to heal the wound. Yet, there is no way to make the swelling go away, and it is a matter of waiting and hoping.
He stated that people who have amputations solely from vascular problems will usually have a history of leg pains, and severe pain in walking. Their troubles are progressive, not spontaneous.

DR. WESTPHAL
Dr. Westphal gave a deposition by video tape which was introduced at trial. He testified he first saw Crenshaw on January 17, the day before surgery. He reviewed the medical records, and in his opinion Crenshaw already had a decreased flow of blood because of arteriosclerosis, but that situation was compounded by trauma.
He testified that the swelling caused a further decrease in blood flow to the foot, that the blood flow would not take care of waste, and the injury would not heal. He stated that the flow of blood may have caused a thrombosis, or clot to develop locally in the arteries at the very end of the foot, and that as a result of the low flow state, impoverished by swelling, that tissue died and gangrene developed.
Dr. Westphal acknowledged it was perfectly conceivable that Crenshaw could have presented himself in the emergency room one day with a cold foot and no pulses on basis of an obstruction either from an embolism, or the blood flow to the foot was so slow due to gradual blockage that the artery had clotted. He testified this was seen relatively frequently; in fact, in most cases this was how physicians saw people with peripheral artery disease. He also acknowledged this possibility in Crenshaw's case.
The distinction to Dr. Westphal in Crenshaw's case was that Crenshaw did have trauma to his right extremity, and he was of the opinion this aggravated a pre-existing condition which led to loss of the extremity.
*266 He acknowledged one could say it was just a coincidence that he had trauma, and would have lost his extremity, anyway; however, he expressed his opinion as follows:
I can simply state that having been there a few days down the line and having reviewed those records, I believe it was a situation where trauma came, compounding atherosclerosis, and led to loss of the foot.
He was of the opinion that most likely there would have been some previous symptoms, such as pain in walking, if atherosclerosis alone had caused the amputation.
Dr. Westphal also was of the opinion that while the documents seen by Dr. McParland would give a general idea as to what was wrong with the patient and what happened to him, they were not sufficiently accurate to make many judgments concerning the patient. The physician needed to go specifically to the entire medical record, not simply the summary. The pathology report was insufficient, in his opinion, and also inaccurate as to the location of the amputation. There was also a discrepancy in the pathologist's finding upon a visual inspection of the blood vessels as normal, while the microscopic diagnosis revealed severe atherosclerosis of arteries and gangrenous necrosis. Dr. Westphal apparently felt some clinical observation should have supported the microscopic diagnosis.
Significant to Dr. Westphal was a review of Crenshaw's hospital records since 1972 which disclosed no evidence of symptomatic athersclerotic disease prior to 1979. This would have indicated a definite predisposing cause to eventual amputation. It was not uncommon for a patient with hardening of the arteries to develop symptoms on exercise, and as the disease progressed, less exercise would cause pain. Also, he would have pain just from the disease if an artery were blocked. Crenshaw was a fairly active man, employed full time, with hobbies such as golfing, fishing, and outdoor recreation.
Dr. Westphal explained that thrombosis was a blood clot. In an embolism a piece of tissue has broken off, floated downstream and blocked a vessel. This would give a patient ischemia. A thrombosis meant the blood flow to the vessel had slowed sufficiently that it clotted, and the clot acted as an obstruction rather than a piece of tissue broken off.
He stated an actual clot could begin at any point, and that physicians are concerned with propagation of the clot, whereby blood adjacent to the clot also clots and extends, making a long line of clot.
Dr. Westphal noted Dr. Locker's examination and initial Doppler evaluation on January 14 showed pulse at the popliteal level was very strong. He was of the opinion there was no femoral artery occlusion or popliteal artery occlusion when Dr. Locker examined Crenshaw on January 14. He also observed that Dr. Locker noted farther downstream the pulses were considerably weaker.
Dr. Westphal stated there were four symptoms of vascular insufficiency and occlusion of vessels: pain; paralyzed muscles; parathesia (tingling); pallor paleness to extremity.
He was of the opinion that on January 9 Crenshaw exhibited none of these symptoms. Yet on January 11 he was complaining of pain, and as time went on he developed parathesia. On the 14th his toes were blue, and upon being admitted to the hospital he evidenced parathesia, a paleness, pallor and a decrease in the pulses, as well as some degree of decreased muscle function.
Upon being asked why the arteries in both sides of his leg would be involved when there was an injury to his foot, Dr. Westphal replied this was the key to the whole situation, and why in his opinion Crenshaw lost his leg.
First, Crenshaw had a pre-existing atherosclerosis causing some decrease to the blood flow in his lower extremity. Then, he had an accident in which his foot was injured. Swelling developed which caused a further decrease in blood flow, and the *267 whole foot swelled. All three arteries were affected. This swelling caused a decrease in blood flow locally to the foot. The blood flow could not take care of the waste product, and the injury could not heal. It might even have caused a thrombosis, or a clot to develop locally in those arteries at their very ends, and thus as a result of the low flow state and swelling, tissue died, and he developed gangrene. This led to amputation. (R. 715)
He said it was very hard to tell how long direct trauma will take to give trouble. In a healthy individual it would take a complete blockage, by having a portion of the artery ripped away. In such a case a patient could develop problems immediately. In a low blood flow situation, however, it could take a while for a clot to develop and the patient have symptoms. The situation was variable.

DR. McPARLAND
Dr. McParland was the medical expert offered by Banker's Life. He testified his first opinion was given following examination of the pathology report, surgeon's report and some  but not all  of the medical reports. He did not have the benefit of any emergency room report or the admitting examinations on January 14, 1979.
Based on the surgeon's report of no blood supply distally to six inches below the knee, no evidence of trauma or injury to any part of the leg or foot, and the pathology report that Crenshaw had arteriosclerosis obliterans (hardening of arteries, narrowing and occlusion of the arterial bore), accelerated by his smoking two packs of cigarettes a day, Dr. McParland was of the opinion this disease alone caused the amputation.
As to trauma playing any part, he testified that the "blood stopped below the knee, according to the surgeon's report," and the trauma was to the foot. Therefore, according to Dr. McParland, any claim that an injury to the foot caused blood stoppage up below the knee was similar "to dropping a tree in a dry river bed and saying that two miles up the stream there's no water because it's the tree's fault."
He explained how the femoral artery in the groin and thigh becomes the popliteal artery, which in turn divides into three parts just below the knee: the peroneal, the posterior tibial and the anterior tibial, which extend and branch off into other arteries in the foot. The major trouble in arterial disease was where the arteries divided at the adductor magnus tendon and took a sharp turn.
An artery is very tough, he explained, like a garden hose, and that if the posterior tibial artery was damaged the anterior tibial artery took over.
He claimed the original records he examined showed no evidence of trauma: no redness, no bruising, no bleeding, as well as no swelling. The only diagnosis made initially by the treating physician was strain of the fourth metarsal ligament, which to Dr. McParland was insignificant.
Dr. McParland testified a review of Crenshaw's history, including that before the accident, confirmed his original opinion that the disease alone caused Crenshaw's problem and trauma had nothing to do with it.
An October 18, 1975, emergency room report showing a visit from Crenshaw to the hospital indicated pain in left calf with the cause undetermined. Further, Crenshaw had been hospitalized in 1978 for an abdominal obstruction, at which time an arterial pulse taken in his left leg showed only one-half normal, and there was no palpable pulse in the posterior tibial artery in his left leg.
Dr. McParland was of the opinion that if Crenshaw had been properly diagnosed originally on January 9, 1979, with proper treatment the leg might have been saved, or at least amputation of only part of the foot would have been required.
Of main significance to Dr. McParland was the fact the surgeon's report indicated no bleeding when the tourniquet was removed. He said the tourniquet was only on for 13 minutes. In practice, after surgery *268 the tourniquet is removed and the surgeon looks for bleeding blood vessels, and they must be sewed shut to avoid massive hemorrhaging. They are not tied off with a catgut. He said the flow was like a garden hose, and the report should indicate the "pulsatile blood flow" from the different arteries. The main reason for noting blood flow was so the next surgeon would know the exact condition of the blood vessel. It must be noted that Dr. McParland has never used tourniquets in his surgery practice.
In this particular case, according to the report of Dr. Westphal (as explained by Dr. McParland), Dr. Westphal took the tourniquet off and his search revealed no bleeders, and he reported no, or virtually no, bleeding, which meant Crenshaw's vascular blood supply stopped above there. Crenshaw's popliteal artery was not pulsating, and therefore not bleeding.
Dr. McParland testified Crenshaw was seen by at least ten doctors and not one of them reported any evidence of injury such as a bruise, broken skin, scratch or redness. Dr. McParland testified that his diagnosis was supported by the fact that physicians using the Doppler ultrasound technique could only find one artery with measurable blood flow.
He testified the physicians determined where to amputate from the Doppler ultrasound showing that except for the peroneal artery there were only monophasic sounds.
On cross-examination Dr. McParland testified that a person with a severe case of arteriosclerosis affecting his lower extremities who dropped something on his foot was in no greater danger of developing problems from such injury than a healthy individual. This diseased condition made no difference.
He also testified a patient could cause an occluded artery by crossing his legs. Then he testified he did not believe a swelling of the foot would contribute to an occlusion. Rather, it was his view the occlusion in the upper part of the leg caused the edema.
Dr. McParland was of the opinion Crenshaw suffered no traumatic injury to his arteries. While acknowledging that trauma could cause a problem, he was of the opinion trauma played no part in Crenshaw's problem:
Because if he had significant trauma to occlude the artery or to rupture or to lacerate it, then it would be one cause. But without any damage, with no evidence whatsoever of trauma  no redness, no swelling, no bruising, no discoloration, no fractured veins  a progressive disease going up his leg, I don't see ... I couldn't correlate trauma to the foot with no blood supply below the knee. [R. 985]
He reached the conclusion there was no swelling, bruising or redness because none of the reports mentioned it.
He was of the opinion Crenshaw's occlusion occurred in the popliteal artery, somewhere above where it divided into three arteries.

LAW
Was there a jury issue on punitive damages?
There are two significant cases which serve as guidelines on this question.
In Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), involving the wrongful refusal by an insurance carrier to pay a claim due under a credit life insurance policy, we repeated familiar criteria justifying award of punitive damages.[5]
Punitive damages are in addition to actual damages, and are in the nature of punishment for the wrongdoing of the defendant, and to set an example so as to deter others from similar behavior. Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), and cases cited.
*269 The basis in awarding such damages is to reward a plaintiff for public service in bringing the wrongdoer to account. Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226 (1962), and cases cited.
Punitive damages may be recovered for a willful and intentional wrong, or for such gross negligence and reckless negligence as is equivalent to such a wrong. Seals v. St. Regis Paper Co., 236 So.2d 388 (Miss. 1970).
In Veal we then stated:
This case demonstrates the necessity of awarding punitive damages when an insurance company refuses to pay a legitimate claim, and bases its refusal to honor the claim on a reason clearly contrary to the express provisions of its own policy. If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant's maximum recovery could exceed the policy limits plus interest, would enable the insurer to pressure an insured to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely. We are of the opinion the refusal to pay the legitimate claim in this case was an intentional wrong and constituted an independent tort as contemplated in Progressive Casualty Insurance Co. v. Keys [317 So.2d 396 (Miss. 1975)], supra.

Of course, if an insurance company had a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, but in this case the defendant had no reason to contest the claim filed with it. We therefore hold that punitive damages were allowable.
354 So.2d at 248.
Richards v. Allstate Insurance Co., 693 F.2d 502 (5th Cir.1982), involved a policy exclusion which this Court in Lowery v. State Farm Mutual Automobile Insurance Co., 285 So.2d 767 (Miss. 1973), had previously held violated public policy and was unenforceable. In spite of our decision in Lowery, Allstate Insurance Company kept the exclusion in its standard policies sold in Mississippi. Allstate did, however, inform its executive personnel to honor claims which would otherwise, under the exclusion, be denied. The lower echelon personnel (apparently not getting the message) denied the claim, based upon the exclusion. The Court of Appeals held retention of the invalid exclusion, failure to provide adequate procedures to prevent erroneous denials on this claim, plus denial of plaintiff's claim justified submitting the issue of punitive damages to the jury under Mississippi Supreme Court decisions.
In Reserve Life Insurance Co. v. McGee, 444 So.2d 803 (Miss. 1983), and the recent case of Blue Cross & Blue Shield of Mississippi, Inc. v. Campbell, 466 So.2d 833 (1985), we held that the trial judge should first determine from all the facts of the case whether the issue of punitive damages should be submitted to the jury. In Blue Cross we stated, "... it is the function and responsibility of the trial court to determine whether the insurance carrier had a reasonably arguable basis, either in fact or in law, to deny the claim." We also stated in Blue Cross that any plaintiff asking for punitive damages had a heavy burden.
Did Bankers Life breach the contract in such a way as to amount to an intentional wrong, or in doing so was it so grossly negligent that the breach constituted an independent tort? D.L. Fair Lumber Co. v. Weems, 196 Miss. 201, 16 So.2d 770 (1944).
Was there an "intentional and unreasonable refusal" to pay a legitimate claim? Was there a legitimate or an arguable reason for failing to pay Crenshaw's claim? Standard Life Insurance Co. v. Veal, supra. Or, was there a "reasonably arguable basis, either in fact or in law, to deny the claim"? Blue Cross, supra.
These criteria in turn require an evaluation of the conduct of Bankers Life in handling this claim, as well as the reason it gave for denying the claim prior to actual trial, and the reason given during the trial.

*270 PRE-TRIAL
Bankers Life's handling of this claim prior to trial is a striking example of how an insurance claim should not be handled.
Crenshaw submitted his claim under the policy. The attending physician's form could not be filled in and completed by his attending physicians because of Air Force regulations. He did, however, sign authorization for Bankers Life to examine every medical record in existence pertaining to himself, and to interview any treating physician.
Bankers Life's own investigative procedures set forth what should have been done in such a case. Indeed, the special claim inquiry form transmitted to Equifax Service requests quite specific information:
Investigation is not confined to points checked below. Cover fully, but in addition, use good judgment in following all leads.
* * * * * *
Interview attending physician PERSONALLY and:
Use confirmation of interview, Form 1425.
Obtain photocopy of his records (if not available, explain).
Emphasize following point(s) when personally interviewing physician:
Question thoroughly regarding policy provisions checked above.
Past health history ...
Determine if injury is sole cause, independent of all other causes.
Exact cite of amputation [this handwritten in]
Obtain hospital record.
Photocopy entire record.
Exclude: nurses notes-temp charts.
EKG reports.
Interview insured and obtain:
Signed statement on confirmation of interview.
Signed medical authorizations.
Description of circumstances surrounding accident.
Description of injuries.
Name and address of doctors and hospitals where confined.
The company did none of this. Only minimial information was procured from Equifax Service, following which no further information was requested by Bankers Life. There was no interview of Crenshaw, no interview of any of his doctors, and no request for medical records. Instead, relying on the three medical entries Crenshaw sent with his claim, his claim was denied. There is no dispute that these medical documents did not tell the complete story of Crenshaw's problems. It is also clear to this Court that what Crenshaw did send was sufficient to either justify payment of his claim, or at least require Bankers Life to make a full and thorough investigation, interview Crenshaw and his family, look at all of his medical records, and interview his doctors before his claim was denied.
Instead Bankers Life denied his claim, and gave as a reason therefor an exclusion under the policy which its executive personnel knew was invalid under Mississippi law.
In Peerless Insurance Co. v. Myers, 192 So.2d 437 (Miss. 1966), a case actually read and cited by counsel for Bankers Life in his memo, we stated, P. 439:
In cases involving insurance policies which allow recovery for "loss resulting directly and independently of all other causes from accidental bodily injury," recovery may be had where the accidental injury aggravates, renders active, or sets in motion a latent or dormant pre-existing physical condition or disease, which in turn contributes to the disability or death for which recovery is sought, and where the accidental injury is a proximate cause of the resulting loss. [Citations omitted]
This well-established principle has been restated by this court and reaffirmed in the cases of Zurich Insurance Co. v. Ruscoe, 203 So.2d 305 (Miss. 1967); Lincoln American Insurance Co. v. Ruscoe, 210 So.2d 769 (Miss. 1968).
*271 In its group insurance policy covering Crenshaw, Bankers Life had the following provision:
Injury wherever used in this policy means bodily injury causing the loss while this policy is in force, directly and independently of all other causes and effected solely through an accidental bodily injury to the insured person.
Despite the consistent holdings of this court that such a policy provision would not have prevented Crenshaw from recovery had the trauma to his foot played any part in the loss of his limb, Bankers Life at all times prior to trial denied coverage under the above policy exclusion. The denial of coverage for this reason appears in all correspondence to Crenshaw or his representatives, and after suit was filed in the answer to the interrogatories.
In our cases we have spoken of "bad faith". This exclusion was particularly deceptive in this case. Common sense tells us there are many accidents which in and of themselves might cause no particular problems, but coupled with the physical condition of the victim can cause serious injury or disease. How many Bankers Life insureds have there been who sustained some minor injury, and because of some underlying physical condition suffered serious problems, yet who accepted at face value the clear language of the policy? It would not be at all beyond the bound of reason for such injured insured to have read the initial rejection, examined his policy, and concluded that he was not covered. Such insured in all likelihood would not have known about our court decisions. Bankers Life, on the other hand, did know about them.
Bankers Life played the odds in this case and lost.
This case is really worse than Allstate. In Allstate the company personnel at least were notified not to deny coverage under an invalid policy exclusion. In this case Bankers Life took the consistent and deliberate choice to deny coverage for an invalid reason.
In their dealing with Crenshaw, Bankers Life personnel knew they were under a duty not to give an invalid reason for denying his claim. This duty was violated.
The Fifth Circuit Court of Appeals in two cases has interpreted our holding in Veal to mean that if the carrier offers no justifiable reason or arguable basis under Mississippi law for denying a valid claim, the issue of punitive damages must be submitted to the jury. Black v. Fidelity & Guaranty Ins. Underwriters, 582 F.2d 984, 990-991 (5th Cir.1978); Vogel v. American Warranty Home Service Corp., 695 F.2d 877 (5th Cir.1983).
We think this is a sound interpretation of Veal. Surely, if a justifiable reason or an arguable basis for denying a claim exists, the insurance company is under a duty to assert it; however, without that foundation the requisite intent or gross negligence necessary for the recovery of punitive damages may reasonably be inferred.
The reason given by Bankers Life for denying this claim up until actual trial was that Crenshaw had not shown that the amputation resulted from an injury "directly and independently of all other causes", and effected "solely through an accidental injury." Such a claim constitutes no arguable defense under Mississippi law. Bankers Life subjected itself to punitive damages by consistently asserting this reason for denying Crenshaw's claim.

FAILURE OF DUTY
Aside from what Bankers Life consistently wrote Crenshaw and his representatives for a period of approximately two years, however, is the manifestly strange conduct of the executive personnel of Bankers Life, including its legal and medical departments.
Dr. McParland noted the absence of an emergency room report in all of his written memos, yet Bankers Life made no attempt to get a copy. The failure of Bankers Life to follow its own investigative procedures is blatant. By reviewing the complete medical records and interviewing the attending physicians and Crenshaw, Bankers *272 Life could have answered any of the questions Dr. McParland raised prior to and at trial.
House counsel for Bankers Life testified he deemed the refusal to be purely a medical reason, not "legal". This is specious. He knew that reputable doctors were of the opinion that trauma did play a part in the eventual amputation, he was certainly aware of our decision in Peerless, and he should have known of authority from several jurisdictions would have affirmed an award to Crenshaw under the policy. See: U.S. Casualty Co. v. Thrush, 21 Ohio App. 129, Ohio L.Abs 714, 152 N.E. 796 (1926) (stubbed toe coupled with arteriosclerosis: amputation); Fidelity Reserve Ins. Co. v. English, 226 Ark. 210, 288 S.W.2d 951 (1956) (roofing tack foot wound coupled with arteriosclerosis: amputation); Bumpus v. Eastern Greyhound Bus Corp., 291 N.Y.S.2d 540 (1968) (irritation of wet feet plus arteriosclerosis: amputation), in which appellate courts in three jurisdictions faced with similar questions affirmed awards of trial courts. Also, see Couch on Insurance, 2d ed., Vol. 10, § 41:86, P. 146.
The executive personnel of Bankers Life, a nationwide health and accident insurance company which has been in business a number of years, unquestionably knew their duty under the law to properly investigate any claim. Proper investigation in this case meant the obtaining of all available medical information relevant to Crenshaw's claim. See generally authorities cited in Couch on Insurance 2d ed., Vol. 15A, § 58.10, P. 277.
This was not a claim by a third party under a liability insurance policy, but a claim from a customer policy-holder of many years. Crenshaw was entitled to an honest, not disingenuous response to his claim.
With these basic premises in insurance law, the following questions are pertinent:

1. Why was Dr. McParland never asked to make his determination based on the applicable legal standards?
This record shows Dr. McParland never knew prior to trial what the legal criterion was in order for the claim to be due under the policy.
Dr. McParland should have been told: "Doctor, if trauma had anything to do with the loss of Crenshaw's leg, even though disease may have played a major part, under Mississippi law this is an accidental loss under the policy. Also, Doctor, we are under a duty to obtain all relevant medical information in order for you to make a determination based on all the facts. Therefore, do not make any medical evaluation until you are satisfied as a physician that you have all the information required to render a valid medical opinion."
Had Dr. McParland been told Bankers Life's responsibility under the law, it is inconceivable he would not have required the company to interview Crenshaw and his family and ascertain precisely how the accident occurred, what discoloration and swelling followed and where the pain was felt. Acting reasonably, Dr. McParland would have examined all medical records available to ferret out the relevant information. He noted discrepancies in the medical records furnished him, and an error as to the final diagnosis, which indicated a need to examine all records. Furthermore, his memos mentioned the missing Emergency Room report, this showing that he had some questions about the history of the accident. After examining all of the records, any further information needed was readily available by interviewing the attending physicians.
Furthermore, even without knowledge of the applicable legal standard, Dr. McParland should have recognized that under any standard of prudent medical practice it is foolhardy to attempt to make a diagnosis on incomplete medical records. Dr. McParland's in-house memos clearly indicate that he knew review of Crenshaw's emergency room record was essential to a trustworthy diagnosis; however, he never required Bankers Life to obtain a copy of it before rendering his opinion. The inter-office memos indicate the executive personnel engaged *273 in a distinct, yet subtle nudging of McParland in the direction of an opinion favorable to it. They "used" their doctor and he quite willingly accommodated them in the affair. Dr. McParland ignored the gaps in information needed in order to make an accurate evaluation, picked the facts favorable to Bankers Life, and gave a medical opinion.[6]

2. Why wasn't Crenshaw told the reason Bankers Life was denying the claim?
As we have noted Bankers Life was under a duty to investigate Crenshaw's claim, and if the company's doctor was of the opinion trauma had nothing to do with amputation, to tell this to Crenshaw.
Bankers Life did neither. Its personnel did not make a proper investigation, and on incomplete information told Crenshaw his claim was denied. The reason they gave was not what their doctor had said, namely: trauma had nothing to do with the limb loss. Instead, they told Crenshaw he had to demonstrate that the accident, solely and independently of all other causes, caused the limb loss, a manifest impossibility in his case. Then, they told him if he had any further information to submit it, assuming no responsibility of checking the facts further themselves.
This conduct evidences a lack of confidence in their own doctor's opinion. For, not until trial began did Bankers Life ever attempt to claim that the actual reason for denying coverage was that the accident had nothing to do with the amputation.

TRIAL DEFENSE
Was Bankers Life entitled to rely on Dr. McParland's opinion?
Bankers Life argues that Dr. McParland was a qualified and reputable doctor. Why should punitive damages be assessed when he testified disease alone caused the limb loss? Since there was a jury question on whether the accident had any causal relation to the amputation, based upon Dr. McParland's testimony, how can punitive damages be assessed?
This ignores the conduct of Bankers Life prior to trial and the reason it gave Crenshaw and his attorney for denying the claim. Lemersal, the house counsel, even advised Herzau to inform Crenshaw's lawyer Bankers Life must have proof that an injury caused the loss "directly and independently of all other causes."[7]
Crenshaw could argue with some cogency Bankers Life should have been estopped to assert this variant defense for the first time at trial.
Furthermore, the issue is not the defense which Bankers Life at trial finally settled upon to defend the suit, but the reason it gave Crenshaw for denying the claim. See: Aetna Life & Casualty Co., Inc. v. Lavoie, 470 So.2d 1060 (Ala. 1985)
Moreover, it is not simply whether a jury question on liability is presented that is determinative, but whether Bankers Life knew the facts it asserted to make the jury issue were valid. Dr. McParland was not an independent physician in this case, but an employee and agent of Bankers Life.
*274 What he knew, or should have known, was imputed to Bankers Life.
An insurance company faced with two separate and distinct medical theories, each of which is supported by reputable physicians, and one of which would exclude liability, probably should not have punitive damages assessed if it asserted in court the theory favorable to its position. This would be true even though a jury rejected the company's position in the trial on actual damages.
It was not disinterested witnesses' particular version of the facts, or one medical theory arrived at by independent evaluation, which Bankers Life chose to rely on in this case. Instead, it was an opinion of its own employee on incomplete facts.
This leaves us with the inquiry as to whether Dr. McParland was a witness or an advocate in his medical opinion. The jury was entitled to examine the bona fides of Dr. McParland's testimony, just as they were entitled to scrutinize the other manifestly strange behavior of Bankers Life we have set out.
In any field of human endeavor judgments based on incomplete information are perilous. It is clear from this record that Dr. McParland both before and during trial freely expressed his opinion when he either did not have all the facts, or having them before him, chose to ignore those facts which either should or conceivably could have altered his opinion.
Three reasons were stressed by Dr. McParland for his assertion trauma had nothing to do with Crenshaw's limb loss bear scrutiny.

1. No Sign of Trauma. Dr. McParland said the medical records showed no sign of redness, swelling, bruising, or breaking of skin. He said of the "ten" doctors who saw Crenshaw from his initial trip to the emergency room through his hospitalization, none noted any trauma. "He did not even break a vein, much less damage an artery."
While the medical records vary on the initial accident causing the foot injury, Crenshaw informed Bankers Life from his first claim thenceforward that the cause of his foot injury was dropping a part of an automobile alternator on his foot. Bankers Life never challenged the accuracy of Crenshaw's version of the initial injury.
That dropping a metal object on an unprotected foot would not cause some swelling and some bruising of that extremity defies common experience. Dr. McParland was never instructed to, and never bothered to obtain a history from Crenshaw or his family, or to discuss the clinical observation of Crenshaw's foot with the emergency room doctors. He never considered the possibility that even if there had been no notation of swelling it might have resulted from a failure to record, rather than the fact there was no swelling or bruising.
Yet, even the medical records dispute Dr. McParland.
When Crenshaw was seen by the resident, Dr. Scott, on January 9, 1979, he noted a "swollen, tender right midfoot."
On January 14 Drs. O'Neal and Locker noted swelling from the foot upward.

2. A severely arteriosclerotic patient who suffers minor trauma to his foot is in no more danger of serious complications than a perfectly normal person.
This particular view, of course, is totally at odds with the medical opinions expressed by both Drs. Hockaday and Westphal. It is also inconsistent with Dr. McParland's own assertion on the witness stand that an occlusion can occur from as simple an act as crossing your legs.
Dr. McParland gave no medical authority for this conclusion, and some rather basic medical authorities state otherwise. Textbook of Medicine, by Cecil, Vol. I (16th ed. 1982), Chapter 36.1 "Peripheral Vascular Disease Due to Organic Arterial Obstruction," p. 318, states:
Patients should protect limbs from cold or trauma; careful attention to keep the skin scrupulously clean, dry and soft is *275 important. Even minor infection such as the dermatophytoses may produce problems. Toe nail trimming should be done regularly and with care.
See, also: Harrison's Principles of Internal Medicine (9th ed.), Chapter 253, "Vascular Diseases of the Extremities"; Robbins and Cotran, Pathologic Basis of Disease (2nd ed.), pp. 608-613. Indeed, in the August, 1979, issue of The Journal of Trauma, there is an article entitled, "Complete Disruption of Axillary Artery Caused by Severe Atherosclerosis and Trivial Nonpenetrating Trauma." [Emphasis added]
Atherosclerosis by its very nature is a narrowing and hardening of blood vessel walls, as well as gradual clogging of the blood stream with fatty deposits. A view that a patient with a severe case of atherosclerosis is no more likely to have severe complications from minor trauma and swelling than a perfectly normal person defies common sense.[8]

3. The occlusion was above the knee.
According to Dr. McParland, even giving Crenshaw the benefit of the doubt that problems could have been caused by his injury, the occlusion which stopped the blood flow was not in the foot, but in the popliteal artery before it branched off into the anterior and posterior and the peroneal arteries, the three main arteries supplying the lower leg and foot. Dr. McParland's opinion was the occlusion was in the popliteal artery or higher in the femoral artery.
Why did he reach this conclusion? Two reasons: (1) the site of the amputation, and (2) the report of surgery, which showed no bleeding when the tourniquet was removed; hence there was a blockage of the artery above the amputation.
This conclusion is curious in view of the medical records and the testimony of Dr. Westphal, the attending surgeon.
As Dr. McParland noted, Crenshaw was seen by a number of physicians. The medical records reveal a chain of events beginning with a man reporting to the Emergency Room complaining of an injury to his foot, observations of progressive worsening of that injury and complications therefrom, efforts to abate or cure the problem, with the final progression up the lower leg to the critical stage of gangrene and necessity of amputation. None of the records suggested Crenshaw's problem originated with, or was solely a clot beginning above the amputation site. Rather, they relate directly to a problem beginning with a foot injury which rather rapidly deteriorated over a period of a few days.
As to the amputation site, Dr. Parland's first contention, Dr. Westphal testified this site was chosen for function and the fact the gangrenous condition had progressed far enough up the foot to indicate six inches below the knee was the safest place. There is nothing in the medical records or Dr. Westphal's testimony suggesting that prior to surgery the decision to amputate below the knee was based upon a medical diagnosis or suspicion there was an occlusion at the kneeline or above.
Dr. Westphal testified no firm conclusion could be made about the blood vessels following the amputation because a tourniquet had cut off the blood flow for a significant period of time prior to surgery. Dr. McParland in his surgery never used tourniquets. Also to be remembered is this tourniquet was applied to a seriously atherosclerotic patient.
Demolishing Dr. McParland's contention that there was no blood flow below the amputation site, there is first the January 14 finding by Dr. Locker, the chief resident in vascular surgery, of a popliteal pulse which grew weaker downstream. Dr. Westphal testified the popliteal pulse found by Dr. Locker was "strong," according to the record. Second, and most conclusive, was Dr. Westphal's testimony, uncontradicted in the record, that on the day prior *276 to surgery he obtained a blood pressure, albeit greatly weakened. Although discounted by Dr. McParland as "worthless," Dr. Westphal also testified a fluorescin dye injection on the day prior to surgery showed a line of demarcation of blood flow from the back of the foot to the back of the ankle.
Dr. McParland ignored Dr. Westphal's personal finding of a pulse on the day prior to surgery.[9]
This Court takes no pleasure in any insurance company having to pay punitive damages. We affirm such an award with extreme reluctance. Yet an insurance company has a duty to the insured to make a reasonably prompt investigation of all relevant facts. It has a further duty, after an adequate investigation and a realistic evaluation of the claim, to tell the insured, its customer, the plain truth. And, if the insurance company cannot give its insured a valid reason for denying the claim, it has a final duty to promptly honor it.
Conduct such as exemplified by Bankers Life in this case is harmful to the insured public. The company violated standards of conduct enunciated by this Court. It grossly violated its own in-house procedure for investigating a claim. Its executive personnel had to realize that a full and complete investigation posed a very strong likelihood of dissipating any contention that Crenshaw's trauma had absolutely nothing to do with the loss of limb. Yet they simply denied the claim for an invalid reason, especially deceptive in this case, because on the surface and to the uninitiated it appeared valid. Why did they not fully investigate so that their doctor would have all the facts? Was it because they thought the full facts would be favorable to them, or unfavorable? We must conclude the latter. They clearly recognized they were skirting a bad faith cause of action, but still played the odds.
Conduct of an insurance company not authorized by law which carries with it a potentiality of great harm to the insurance public is an outrage, and should be condemned. Punitive damages in such a case is an appropriate, and perhaps the only remedy. In this kind of case, it is the medicine most likely to cure the malady.

VOIR DIRE, TESTING QUALIFICATIONS OF EXPERT
In the voir dire inquiry of Dr. McParland's qualifications, he was asked if he knew Marlene Tobin, and replied, "Yes." Then, he was asked if he knew Lillian or John J. Hamparian, to which he responded he did not recall the name, but might know them. Then he was asked if they had not sued him. He replied he did not know about Hamparian, but there was a suit just *277 instituted, "... she didn't sue me; she sued ten doctors ... and I was not the doctor attending her at the time that that suit was instituted." (Vol VII, pp. 955-956)
He was asked what the suit was about, how it was he was sued, and he replied Dr. Donald D. Dwyer was the attending physician. When asked her problem, he replied she was a 40-year-old woman who developed cancer and had a lot of other problems. All the above testimony was elicited without objection.
Dr. McParland was then asked, "What about Marlene Tobin?" An objection to this question was sustained. Counsel then asked the doctor if he had been sued by anybody else, to which he responded, "Once." There was then an objection, which was overruled, and Dr. McParland replied that he had been one of the doctors sued in an anesthetic death that had occurred a number of years before, he could not recall when.
Bankers Life argues the above was improper voir dire but counsel has failed to favor us with any case in point.
Most of this testimony was elicited without objection, following which there was an objection to a question, which was sustained, but no motion for a mistrial. We are therefore confined to the question of whether reversible error was committed in the doctor's answer to the final question.
Dr. McParland was offered as an expert on the human anatomy. If there was anything about his past conduct which reflected upon his knowledge, clearly it was admissible. See: Wood v. American Life Ins. and Trust Co., 7 How. 609 (Miss. 1843), p. 631; "... when particular credit is concerned, particular inquiries are proper." The question is whether such past conduct was relevant to the inquiry.
In this case the questioning never proceeded to the point where it is clear, one way or another, that the one suit affected his knowledge in the capacity in which he was testifying.
In hindsight we can observe it would have been preferable for the inquiry concerning the litigation in which Dr. McParland found himself a party defendant to have been conducted in chambers in order to ascertain whether such suit in any way bore upon his professional qualification to express an opinion. No such request was made, however.
In inquiries of this nature, trial courts are given broad discretion, and there must be a showing of an abuse to warrant a reversal. See: 3A Wigmore, Evidence (Chadbourn Rev. 1970), Section 991, pp. 922-926; Jones The Law of Evidence (6th Ed.), Vol. 2, § 14:30, p. 668. We cannot find an abuse of discretion on the part of the trial court, and even if there were, it was not reversible error. In these litigious times the mere fact some person has been sued hardly affects either his reputation or credibility.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, SULLIVAN and ANDERSON, JJ., concur.
WALKER, P.J., and ROBERTSON and PRATHER, JJ., dissent.
SULLIVAN, Justice, for the Court, Part II:
Bankers Life argues that the amount of damages awarded  $1,600,000  is grossly excessive and should be substantially reduced. The point is brought before us by Bankers Life's assignment that the trial judge erred when he denied Bankers Life's post-trial motion for a remittitur of punitive damages or, alternatively, a new trial on the amount of punitive damages.
This issue must be adjudged under the same process of adjudication as is applicable on any other assignment of error. This involves the familiar three-step process of identifying and articulating the applicable rules of law, resolution of all questions of evidentiary fact, and application of the law to the facts. See Boardman v. United Services Automobile Association, 470 So.2d 1024, 1029 (Miss. 1985)
*278 With regard to punitive damages, our rules are necessarily general. Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to certain general factors which include:
(1) Such amount as is necessary for the punishment of the wrongdoing of the defendant and deterring defendant from similar conduct in the future, Standard Life Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977);
(2) Such amount as is reasonably necessary to make an example of the defendant so that others may be deterred from the commission of similar offenses. Reserve Life Insurance Co. v. McGee, 444 So.2d 803, 808 (Miss. 1983); T.C.L., Inc. v. LaCoste, 431 So.2d 918, 923 (Miss. 1983); Tideway Oil Programs, Inc. v. Serio, 431 So.2d 454, 460 (Miss. 1983); Snowden v. Osborne, 269 So.2d 858, 860 (Miss. 1972); and
(3) The pecuniary ability or financial worth of the defendant, Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1978); Jones v. Carter, 192 Miss. 603, 610, 7 So.2d 519 (1942).
Punitive damages are an important component of the remedial side of our law whose purpose is the protection of the customer. On these facts our law would seem to authorize a quantum of punitive damages to be that amount reasonably necessary to punish defendant and to provide a substantial deterrent to it and others similarly situated from the commission of similar offenses, all consistent with the pecuniary ability and financial worth of the defendant. In this context, we note that Bankers Life reported to the Commission of Insurance in its 1980 report total assets in excess of $1,300,000,000, and net assets of approximately $294,000,000.
Our case law is to the effect that the determination of the amount of punitive damages is a matter committed solely to the authority and discretion of the jury. See e.g., Commodore Corp. v. Bailey, 393 So.2d 467, 471 (Miss. 1981); Collins v. Black, 380 So.2d 241, 244 (Miss. 1980); Sandifer Oil Co. v. Dew, 220 Miss. 609, 71 So.2d 752 (1954); Teche Lines, Inc. v. Pope, 175 Miss. 393, 166 So. 539 (1936). These same cases, frequently in the same sentence as has been used to commit sole discretion to determine the amount of punitive damages to the jury, use language expressing a view to the effect that the jury's verdict may be interfered with if it is found "arbitrary or unreasonable" or "against the overwhelming weight of the evidence". Commodore Corp. v. Bailey, 393 So.2d at 472. Other cases recognize that a jury's finding on amount of punitive damages may be disturbed "for exceptional causes". Collins v. Black, 380 So.2d at 244; Snowden v. Osborne, 269 So.2d 858, 861 (Miss. 1972); Woodall v. Ross, 317 So.2d 892, 896 (Miss. 1975).
Our general rule is that a damage award is so excessive that it should be altered or amended when it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience. Jesco, Inc. v. Shannon, 451 So.2d 694, 705 (Miss. 1984); Entex, Inc. v. McGuire, 414 So.2d 437, 444 (Miss. 1982); James Reeves Contractor, Inc. v. Chain, 343 So.2d 1229, 1232 (Miss. 1977). This shock must be experienced by the judicial conscience, not the actual conscience of the members of this Court. Schoppe v. Applied Chemicals Division, 418 So.2d 833 (Miss. 1982), (contrast amount of verdict with amount of actual damage). We are not authorized to disturb a jury verdict regarding amount of damages because it "seems too high" or "seems too low". Toyota Motor Co., Ltd. v. Sanford, 375 So.2d 1036, 1037 (Miss. 1979).
Where this test is met, the trial judge is authorized generally to enter a remittitur or an additur as may be appropriate under the facts and circumstances of the particular case. [Miss. Code Ann. § 11-1-55 (Supp. 1984)]. This authority to enter a remittitur or an additur exists where the nature of the damage award at issue is *279 punitive or exemplary. See Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239, 249 (Miss. 1977) (rule impliedly recognized). We hold that motions challenging the quantum of punitive damages and seeking either a remittitur or an additur are subject to the same rules as motions challenging the amount of damage awards generally. This means that on appeal we are reviewing a matter which is by its very nature committed to the sound discretion of the trial judge. See Jesco, Inc. v. Whitehead, 451 So.2d 706, 714-716 (Miss. 1984) (Robertson, J., concurring). What in essence we are dealing with is a motion for a remittitur or in the alternative for a new trial on the issues of damages only. Where the trial judge acts upon these matters, we reverse only if the trial judge abuses or exceeds his discretion. Dorris v. Carr, 330 So.2d 872, 874 (Miss. 1976).
While no hard and fast rule may be laid down with regard to the maximum amount of punitive damages which may be awarded in a given case, it is difficult to imagine that, consistent with the rules of law recited above, the judicial conscience could be shocked by a punitive damages assessment which is less than 1% of the financial net worth of the defendant. The record reflects that the net worth of Bankers Life in the year immediately preceding the trial was $294,000,000. The amount of punitive damages assessed by the jury was $1,600,000 or 0.54421% of the net worth of the company. However high that amount may "seem", it may not, consistent with our rules of law in the area, be said to shock the judicial conscience.
AFFIRMED.
PATTERSON, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE and ANDERSON, JJ., concur.
WALKER, P.J., and HAWKINS, ROBERTSON and PRATHER, JJ., dissent.
HAWKINS, Justice, dissenting as to Part II:
This case gives me a special empathy with Moses. Having nursed the children of Israel for forty years in the wilderness, and against all expectations and insuperable odds, miraculously delivering them to Canaan's boundary, he was not permitted to go in with them. He went somewhere off in Moab and quietly expired. (Deuteronomy, 34)
While neither the travails of this case nor my puny talents remotely approach that historic figure, at least I do know how old Moses is bound to have felt that day.
In what I hope just as modest but not a terminable way I must part company now with my colleagues at the very end of this legal adventure. I simply cannot come to any conclusion but that a $1,600,000 punitive damages award was grossly excessive, and could have resulted only from prejudice or passion, or a misconception of the law, of the jury.
Of course, while those twelve citizens of Jackson County would not have been quite normal not to have had some dyspepsia or bile enlargement from Bankers Life's conduct, that very irascibility carried them to a grossly excessive award, in my view. Their reason was somewhat dissipated by their annoyance, thus the size of the verdict.
The scholarly opinion of the majority has given us a comprehensive and concise statement of punitive damages law. The decisions they cite I would cite as authority in reducing the award. Our difference comes in the application of these decisions, and our sense of proportion on the amount. I think the majority has considered only the net worth of Bankers Life.
Punitive damages decisions from this Court are not numerous, but clear principles are nonetheless discernible. They are that punitive damages are not a matter of right, but are granted as punishment, and to set an example to deter others who might otherwise be similarly inclined. The reason for the award, being neither a matter of compensation nor of right, is to reward the plaintiff for the public service rendered in successfully bringing the action. *280 A jury cannot be directed to award any sum as punitive damages. They can only be authorized under proper instructions to consider the propriety of some punitive damage award. Finally, the amount of the award is solely within the discretion of the jury, and will not be disturbed unless for "exceptional causes" or the amount is arbitrary or unreasonable. These principles may be found in the following cases: Yazoo & Miss. Valley Railroad Co. v. Williams, 87 Miss. 344, 39 So. 489 (1905); Hines v. Imperial Naval Stores, 101 Miss. 802, 58 So. 650 (1912); Yazoo & M.V.R. Co. v. May, 104 Miss. 422, 61 So. 449, 450 (1913); Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 141 So.2d 226, 233 (1962).
These punitive damages principles were summarized in Snowden v. Osborne, supra, at 860-861:
... They are granted in the nature of punishment for the wrongdoing of the defendant and as an example so that others may be deterred from the commission of similar offenses thereby in theory protecting the public [citations omitted]
* * * * * *
The basis in awarding such damages to the injured party is that of rewarding an individual for public service in bringing the wrongdoer to account. [Emphasis added]
We also stated in that case that the amount was discretionary and should not be interfered with unless for "exceptional causes." See also, Veal, supra, at 247.
Three basic ingredients are therefore before the jury to be weighed, balanced and harmonized: punishment, public example and reward to the plaintiff. Each is essential, and it has never been suggested by any authority in this state than either one of these is more important than the other. The final verdict should be a fair balance of the three under all the circumstances of the case.
Then what part does the wealth of the defendant play? It is only relevant in determining an amount that constitutes meaningful punishment, and by no means the only relevant consideration under punishment, to which I will return. And, of course, it has nothing whatever to do with public example or reward to the plaintiff.
While I certainly agree with the majority that the net worth of Bankers Life makes it obvious that to constitute meaningful punishment, Bankers Life requires more monetary penalty than a filling station attendant, or a Piggly Wiggly store owner, I cannot agree with the concept the bigger they are the more we ought to zap them. The distinction may be somewhat subtle, but I believe this Court stated it in Yazoo & M.V.R. Co. v. Williams, supra, at 492:
It is suggested in argument that the wealth of the wrongdoer may be shown in evidence, in order to permit the jury to consider that wealth in determining the amount of punitory damages to be awarded. This is true, but only upon the idea already advanced, that the jury may gauge the amount of punishment necessary to be inflicted in order to deter a repetition of the offense; but it is in no proper sense introduced as testimony to influence the verdict. [Emphasis added]
In Allen v. Ritter, 235 So.2d 253, 256 (Miss. 1970); and Collins v. Black, supra, at 244, we plainly stated that pecuniary ability to respond might be considered by a jury, but it was not the only factor to be considered.
Under the principles announced in our decisions, the jury should be searching for an award which does the following: constitutes a meaningful punishment to the defendant, sets a public example, and rewards the plaintiff, and as above stated, these factors carry equal weight. There should be a harmonizing of the three factors, not some sum which shows only one factor has been considered (and it to influence the amount of the verdict), and the other two ignored.
If there is a remote possibility in the future of an inclination on the part of any individual to look kindly upon my tenure on this Court, I hope I am remembered for the *281 awe and reverence I exemplified for the jury system.[1] My profound deference to the jury system, however, has not blinded me from what is obvious here: this jury paid no more attention to the last two factors in reaching their verdict than to some Jackson County swamp rabbit.
Insofar as setting an example for others similarly inclined, a punitive damages award one-fifth the size of this would set off warning gongs and flashes in the head-quarters of every insurance company in this country. Likewise, I certainly favor rewarding the plaintiff and his counsel for the service they have rendered this state in bringing this action.[2] But, an award of $1,600,000?
And even as to a punishment, while the proof indicates Bankers Life can certainly respond to this amount in damages, does that mean it took anything approaching this sum to constitute meaningful punishment? To make them quit this practice? If a fraction of this sum would not teach this company a lesson that would remain forever silhouetted along the skyline of Bankers Life's memory, then it has no business in being in business.
In my view the wisdom of punitive damages, the rare instances when they should be awarded, and factors to consider in the amount, have evolved through two centuries of human experience. If we suddenly warp and distort these principles by ignoring some, and stretching others out of proportion, salutary punitive damages awards will not be simply rare, as they now are (and should be); they will be replaced. This case will be Exhibit A in the argument of all those who wish to do away with punitive damages altogether, reduce them to some meaningless penalty, or create an impossible standard to make any punitive damage award.
It is pertinent to note the original declaration filed January 11, 1980, asked for $400,000 punitive damages. It was amended November 27, 1981, four days before trial, to ask for $1,635,000 in punitive damages.
Also, the circuit judge refused a direct remittitur, but the significance of this refusal is diminished because he was erroneously of the view he had no authority to reduce the award. What he might have done had he been required to maturely reflect upon the matter we cannot know.
Of course, net worth is relevant on what constitutes meaningful punishment. In Veal, supra, on a punitive damage award of $50,000, we noted the company was worth $85 million. In Reserve Life, supra, on a punitive damage award of $152,000, we noted the company had a net worth of $102 million. Here, as the majority notes, Bankers Life had a net worth of $294 million.[3]
Yet considering just punishment, all attendant circumstances are proper considerations, not just net worth. Some of the other pertinent considerations are the degree of the offense, and whether there was malice, Snowden, supra, at 861; motive, Will v. Hughes, 172 Kan. 45, 238 P.2d 478 (1951); Wrains v. Rose, 175 So.2d 75 (Fla. 1965); the injury intended, Booth v. Kirk, 53 Tenn. App. 139, 381 S.W.2d 312, 317 (1964); Hildreth v. Hancock, 156 Ill. 618, 41 N.E. 155 (1895); public sense of justice *282 and propriety, Schutz v. Morris, 201 S.W.2d 144 (Tex.Civ.App. 1947).
Thus, even if the only factor to be considered was a meaningful, just punishment, I would think just as important as the net worth of Bankers Life is the fact that as far as this record shows, this is the first time this company has been sued for punitive damages in this state, the plaintiff has never contended Bankers Life is more than a first offender. Can we do nothing when upon its first offense the jury zaps the company $1,600,000?
We have stated that a punitive damage award should not be disturbed unless for "exceptional causes," Yazoo & M.V.R. Co. v. Williams, supra, at 491; Snowden, supra, at 861; or it is "arbitrary or unreasonable." See Commodore Corp. v. Bailey, 393 So.2d 467 (Miss. 1981). This case falls squarely within both authorities. The award clearly ignored considering what amount would sufficiently constitute a public example and warning as well as a fair reward to the plaintiff. It grossly exceeds a sum necessary to constitute some meaningful punishment to Bankers Life in this case. While at first blush the majority's view might appear reasonable, this is precisely what it is, a cursory examination; it simply will not survive analysis and scrutiny.
The majority has also left me with the statement that the amount of the award must shock the "judicial" conscience, not the "actual" conscience. I lack the sophistication to discern the distinction between the two. I have enough trouble with the one I've got, and it would not rest comfortably if I remained silent on the amount of the award.
I would by proper remittitur reduce the amount to an award of $750,000 punitive damages. In so doing, we would still be showing deference to the trial jury.[4]
ROBERTSON, Justice, dissenting:

I. Why  In A Nutshell  I Dissent
If in the course of a home auto repair project, one drops the alternator on one's big toe, no doubt that would hurt. A soft tissue injury, perhaps even a broken toe might result. Yet it seems a bit farfetched that such an accident, ten days later, would necessitate amputation of the right leg six inches below the knee. It is hardly unreasonable that one seeking a monetary award based on such a causal connection should be required to prove it. Yet because it did just that and exercised a right I should have regarded as vested in it by our law, Bankers Life and Casualty Co. finds itself today assessed $1,600,000.00 in punitive damages with no apparent alternative except payment.
I dissent. I dissent, with the greatest respect for my colleagues in the majority and hope it not be thought disrespectful nor found inappropriate that I pointedly point out the major errors found in the opinion of the Court.
To begin with, Bankers Life denied Lloyd Crenshaw's claim in reliance upon the opinion of its medical director, Dr. Nathaniel P. McParland, a specialist in vascular diseases and surgery, with credentials and experience far in excess of that possessed by Plaintiff Crenshaw's doctors. Dr. McParland's opinion was that the physical findings and post-surgery pathology report reflected that the sole cause of the amputation was a pre-existing arteriosclerotic condition in Crenshaw's leg. This was Dr. McParland's opinion when he first reviewed *283 the medical records and it remained his opinion at trial. Such a medical opinion ought be recognized as affording an insurer an arguable reason for refusal to pay Crenshaw's claim.
When he gave his original pre-suit opinion, Dr. McParland did not have all of the medical records (including the emergency room record which suggested an initial trauma). The majority implies that with sinister motives Bankers Life's claims department withheld pertinent medical records so that Dr. McParland would render an opinion favorable to the company's position. All of this is seen as much ado about nothing in that Dr. McParland made clear from the witness stand at trial that he had (some two weeks earlier) reviewed all of the medical records and that the "new" records served only to confirm his original opinion.
The majority complains that before suit was filed Bankers Life denied Crenshaw's claim on the authority of a policy provision, literal enforcement of which had been precluded by our prior decision in Peerless Insurance Co. v. Myers, 192 So.2d 437 (Miss. 1966). The argument is so much judicial legerdemain. A careful reading of the three letters involved will reflect that in each Bankers Life denied the claim because it believed that the sole cause of the amputation was the pre-existing arteriosclerosis (which everyone agreed Crenshaw had) in the leg unexcited by trauma. This view of the ultimate facts derives from the opinion of Dr. McParland. Nothing in Peerless or in any other case decided by this Court precludes an insurer's denial of such a claim on such facts.
The opinion of the Court then steps wholly outside its adjudicatory function and degenerates into pure advocacy as it seeks to discredit the testimony of Dr. McParland. Significantly, the majority never hints that Dr. McParland was not "qualified" to appear as an expert witness or that his opinion testimony was not competent to go to the jury, nor that Crenshaw was entitled to a peremptory instruction in his favor on the liability feature of the underlying policy claim, notwithstanding Dr. McParland's testimony. Instead, the majority vigorously "cross-examines" Dr. McParland and then makes a jury argument that the good doctor's opinion is flawed. What the majority ignores is that, where the question procedurally is whether a j.n.o.v. should have been granted, there is no case known to our jurisprudence which sanctions this method of evaluating a key witness' testimony.
The majority opinion treats curiously our decision of only a few months ago in Blue Cross and Blue Shield of Mississippi, Inc. v. Campbell, 466 So.2d 833 (Miss. 1984). There we held that in the "vast majority of cases" the insured's claim for punitive damages should not be submitted to the jury where the plaintiff insured is not entitled to a peremptory instruction on the liability feature of the underlying contract claim. 466 So.2d at 843. We reiterated that holding in State Farm Fire & Casualty Co. v. Simpson, 477 So.2d 242, 254 (Miss. 1985). If applied to the case at bar, the Blue Cross/State Farm rule would require reversal. The majority, however, ignores this central thrust of Blue Cross and State Farm, never bothering to suggest why this case is not one of the "vast majority", and instead cites and quotes from a portion of the Blue Cross opinion not followed by the trial judge here, with respect to which no one (least of all the majority opinion) has suggested error, and having no discernible relevance to the adjudication of the case at bar.
Finally, the majority seems to hold that an award of punitive damages to a plaintiff insured need only be predicated upon an authoritative finding that, objectively speaking, the insurer had no arguable reason for denial of the claim. In so doing the majority (a) modifies (albeit sub silentio) several prior decisions of this Court which impose a much heavier burden upon one who would recover punitive damages and (b) establishes a substantive rule by reference to which an insurer may become subject to an assessment of punitive damages wholly different from and lesser than that *284 applicable in all other punitive damages cases, without offering any reason why assessment of punitive damages in bad faith refusal cases should be measured by standards other than those applicable generally.
In the end I would reverse and render so much of the judgment below as assesses punitive damages in favor of Lloyd Crenshaw and against Bankers Life. When our heretofore existing rules of law are applied to the case at bar, and when passion and prejudice are excised, I suggest with deference that reversal can be the only result. I would affirm the award of $20,000.00 on Crenshaw's underlying policy claim and, for reasons explained below, add thereto pre-judgment interest, reasonable attorneys fees and reasonable legal expenses.

II. Bankers Life Had An Arguable Reason For Its Refusal To Pay Crenshaw's Claim

A. Bankers Life Reasonably Relied On The Opinion Of Its Medical Director That The Sole Cause Of Amputation Was Pre-Existing Arteriosclerosis

Bankers Life and Casualty Company did not rely merely upon the intuitive implausibility of Lloyd M. Crenshaw's claim when it denied that claim, pre-suit and at trial. Rather, Bankers Life consulted a highly qualified specialist[1] in vascular diseases who  pre-trial and at trial  gave an unequivocal opinion that the sole cause of the amputation of Crenshaw's leg, as distinguished from the pain and soreness in his big toe, was a preexisting arteriosclerotic condition. This was no idle expert opinion. Every shred of medical evidence on the point reflected that the 61-year old Crenshaw had long suffered progressively worsening arteriosclerotic changes in the blood vessels of his right leg. Well prior to January 6, 1979, Crenshaw's years as a chain smoker had played a substantial part in producing the condition, the net effect of which was that the blood flow into Crenshaw's right leg had stopped below the knee. Because of the blood stoppage near the knee, any trauma to the big toe could not have borne a causal connection to the subsequent amputation.
Dr. McParland illustrated the point quite simply. The claim that trauma to Crenshaw's big toe caused the blood stoppage below the knee would be similar "to dropping a tree in a dry river bed and saying that two miles up the stream there is no water because it's the tree's fault". Dr. McParland was of the opinion that, if the falling alternator had been the culprit, at most only a part of the foot would have had to be amputated. Only the preexisting severe arteriosclerotic conditions could have required the amputation which was in fact performed.
Confirming the intuitive view that dropping an alternator on one's big toe should not lead to the amputation of one's leg and broadening our perspective, Dr. McParland made clear that arteriosclerosis frequently leads to amputation sans trauma.
Q. Doctor, is it probable, to a medical probability, that one could suffer a severe arteriosclerosis condition and have to undergo limb amputation without the onset of trauma?
A. That's the usual.
Generally speaking, only trauma of bone-crushing proportions (which Crenshaw's trauma clearly was not) leads to amputation.[2]
*285 Substantial evidence in the record supported Dr. McParland's opinion as to the cause of the amputation. The surgeon's report indicated no bleeding when the tourniquet was removed following the surgery. The pathology report of the amputated stump concluded
Right foot and lower leg: severe arteriosclerosis of the arteries. Gangrenous necrosis.
This strongly supports Dr. McParland's ultimate opinion regarding causation.[3]
The proper context for understanding the issues tendered begins with acceptance of the notion that the unanimous opinion of the medical experts was that the arteriosclerotic disease suffered by Crenshaw in his right leg was even on the view most favorable to Crenshaw, an underlying cause of the amputation. The only issue was whether this pre-existing disease was the sole cause of the amputation or whether it combined with accidental trauma to cause the amputation.
Of substantial importance and relevance is the testimony of Dr. Christopher T. Westphal, an Air Force general surgeon who performed the surgical amputation.[4] While he was of the opinion that the trauma was a precipitating cause of the amputation, together with the preexisting arteriosclerotic condition, Dr. Westphal conceded the plausibility of Dr. McParland's opinion. Employing terms taken from the majority opinion, Dr. Westphal said that Dr. McParland's thesis was "perfectly conceivable" (p. 265), a "possibility" (p. 265), and that
one [such as Dr. McParland] could say it was just a coincidence that he [Crenshaw] had trauma, and would have lost his extremity, anyway; ... (p. 266)
Dr. Westphal never questioned that Crenshaw had a preexisting arteriosclerosis causing a decrease to the blood flow in his right leg.[5] (p. 266)
The third and final medical witness at trial was Dr. Hockaday, a general surgeon practicing in the Pascagoula area without substantial experience or expertise in vascular diseases. Dr. Hockaday was of the opinion that the amputation was caused by the combined operation of trauma and the preexisting arteriosclerosis.[6]

B. While The Verdict He Obtained Is Beyond Attack, Crenshaw Was Not Entitled To A Peremptory Instruction In His Favor On Liability Phase Of His Underlying Policy Claim
At the risk of stating the obvious, a point needs to be made here: With respect to the basic claim of Lloyd Crenshaw for benefits under the Bankers Life policy, there was a substantial dispute or difference of opinion among the medical experts as to whether Lloyd Crenshaw's dropping the alternator on his big toe bore a sufficient causal connection with the amputation so that policy *286 benefits were payable. The jury resolved that dispute in Crenshaw's favor and, no doubt, because of the credible testimony of Drs. Westphal and Hockaday, the jury's determination in that regard is unassailable. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
The converse is likewise true. If the jury had returned a verdict in favor of Bankers Life on the liability phase of the underlying contract claim, that verdict too would have been beyond attack. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975). To put the point another way, when at the conclusion of the evidence at trial Crenshaw requested a peremptory instruction on the liability feature of the underlying contract claim, that request was and necessarily had to be denied. Applying the Paymaster Oil rule, we should surely have reversed had the trial judge granted any such peremptory instruction.
We see nothing in the majority opinion which questions this view of the evidence. Indeed, the majority's quite fair and evenhanded description of the expert testimony (pp. 264-268) belies the possibility of any such peremptory instruction having been appropriate.
A related notion bears emphasis. Nothing said anywhere in this opinion proceeds upon or may be shown to depend upon acceptance of the proposition that Dr. McParland's opinion regarding the cause of Crenshaw's amputation was correct. Rather, the premises upon which this opinion rests are (a) that Dr. McParland was a qualified medical expert witness, see Hall v. Hilbun, 466 So.2d 856, 873-74 (Miss. 1985); House v. State, 445 So.2d 815, 822 (Miss. 1984), (b) that all necessary predicates to admissibility of his opinion regarding causation of the amputation were laid, (c) that Dr. McParland opined that the sole cause of the amputation of Crenshaw's leg was the arteriosclerotic disease process existing pre-January 6, 1979, and (d) this opinion was of sufficient force that, if the jury had found for Bankers Life on Crenshaw's underlying contract claim (assuming all other proof at trial remained the same), neither the trial judge nor this Court consistent with Paymaster Oil and progeny would have had authority to order entry in Crenshaw's favor of judgment notwithstanding the verdict. Until error be shown in one or more of these premises, it seems to my mind that we should reverse and render so much of the judgment as assesses punitive damages against Bankers Life.
A positive statement of my view of the matter having been stated, back to the negative, an exposure of and exposition upon the majority's major errors.

C. Bankers Life's Basis For Denial Of Crenshaw's Claim Remained The Same From First Denial Through Trial
The innuendos in the majority opinion to the contrary notwithstanding, the day of trial was by no means the first time when Bankers Life denied the underlying policy claim by reason of the proposition that the amputation was caused solely by the preexisting arteriosclerotic changes within Crenshaw's right leg. The record reflects that Dr. McParland rendered his first opinion to Bankers Life on June 19, 1979, and that the opinion he gave at that time was precisely the same as he gave at trial. From the outset Bankers Life relied on the opinion of Dr. McParland and denied the claim solely on that basis.
The first time Bankers Life communicated its decision to deny the claim to anyone acting on Crenshaw's behalf was the July 11, 1979 letter William Herzau wrote to Crenshaw's employer in Pascagoula. That letter stated in pertinent part that
according to the medical information we have, it appears that Mr. Crenshaw's limb loss was because of severe arteriosclerotic changes in his distal blood vessels and subsequent ischemia and necrosis....[7]
*287 This was Bankers Life's first denial of the claim and the reason given was the same as that tendered at trial.
On April 8, 1980, Bankers Life wrote to Crenshaw again denying the claim. Again Bankers Life gave as its reason for denying the claim that
according to all the medical information we have, it appears your limb loss was due to severe arteriosclerotic changes in the distal blood vessels and subsequent ischemia and necrosis... .
In this letter Bankers Life adds "This opinion was confirmed in the pathology report".[8]
A third pre-suit denial of the claim occurred on June 27, 1980, when Herzau wrote to Crenshaw's attorney and again gave as his reason that
the operative report indicates the instructing arteriosclerotic area most likely is in the femoral or popliteal artery area although no mention of the femoral or popliteal pulses is noted.
At trial Bankers Life offered this same basis for its denial of Crenshaw's claim. See, for example, Mr. Lemersal at R. 869:
Q. Why was Mr. Crenshaw's claim denied?
A. Because in the opinion of our medical director, the cause of the loss was a disease process.
Mr. Blessing at R. 978:
Q. Now, what was the basis that you used in denying the claim? What did you tell Mrs. Doyle to tell Mr. Crenshaw?
A. According to the medical findings which our doctor reviewed, the cause of the amputation was strictly due to a disease process and not due to any injury.
Mr. Blessing at R. 909:
Q. And the denial was based on Dr. McParland's report?
A. Yes, it was.
Mr. Herzau at R. 925:
Q. If the alternator falling on the foot contributed to the injury ... if the alternator was considered to be an injury and contributed to a problem, I would guess it should be paid. This is what I was questioning. This is what I was trying to determine.
Dr. McParland at R. 978:
Q. Assuming there was trauma, from history, do you attribute any percentage of his loss to a trauma situation?
A. Absolutely none.
Q. And you conveyed your findings to the claims department at Bankers Life?
A. I did.
In short, Bankers Life's pre-suit position remained consistent from July 11, 1979 forward. That position expressed in three separate letters to Crenshaw or his representatives was substantially identical to the position taken by Bankers Life at trial. It is disingenuous to suggest that Bankers Life ever relied on any basis for denying the claim other than the view that the sole *288 cause of the amputation was the pre-existing arteriosclerotic condition in Crenshaw's leg.

D. The "Missing" Medical Records Merely Served To Confirm Dr. McParland's Opinion Regarding The Cause Of Amputation
The majority complains at length that Bankers Life failed to disclose to Dr. McParland all of the medical records in the case and particularly the emergency room report. This is much ado about nothing.
The majority opinion never makes quite clear just what it is that Dr. McParland would have learned from the medical records he did not have prior to trial that would have informed his opinion or would have been arguably inconsistent with his opinion. We can only presume that it is the fact of trauma, for it is true that at the outset Dr. McParland was proceeding on the assumption that there was no trauma. In this connection we note a sampling of the medical records regarding the history of Crenshaw's trauma and to begin with the emergency room report of January 9, 1979, states that Crenshaw "driving auto and hit pole with foot on brake". (p. 257) On January 9, 1979, a clinical record states that Crenshaw "struck on ball right foot with rebounding clutch". (p. 257) Then on January 14, 1979, a report states that Crenshaw "injury to his right ankle in an auto accident". (p. 259) Suffice it to say that these reports are not remarkable for their accuracy. Yet the majority says Dr. McParland should have had them.
Dr. McParland was cross-examined about this supposedly significant failure on the part of Bankers Life's claims personnel to furnish him all of the medical records. This exchange is revealing.
Q. Well, Doctor, the question I'm trying to get at is that you didn't get the full medical records of Lloyd Crenshaw until about two weeks ago; did you?
A. All those medical records ... no, I didn't. But all they do is confirm the facts that the man had no blood going down his leg. It's just confirmation. It didn't add anything to the ... to the disease which was present, and the records are not going to change. What he had, he had. What he's got, he's got ... and he's going to have it.
Q. And it's not significant to you at all the fact that Lloyd Crenshaw is sixty-one years of age, is an active person, worked up until the time of his amputation and then sometime thereafter as much as forty hours regularly every week, plays golf, goes dancing ... that doesn't mean a thing.
A. No. I did the same operation on a professional dancer. It doesn't make much ... you know, until its completely occluded, it doesn't make that much difference. You still have some blood supply.
Q. Doctor, would you agree with this? Is it possible to drop something on your foot to aid in occlusion? Is that possible?
A. It's possible if you break some bones and if you have a crushing injury.
Q. In other words, it would have to be a most crushing injury then.
A. Yes, it would. It's always associated with broken bones. And if you don't have a pulse down there, it doesn't make any difference what you drop on it. There's still no pulse, whether you drop it or don't drop it. The surgeon said there was no blood going down there, and you can't change that.[9]
We recognize, of course, that there is evidence in the record that may be seen in conflict with that which Dr. McParland relied *289 upon. The majority notes evidence of a pulse below the amputation site. (Majority opinion, p. 276, footnote 9). Coupled with the description given of the trauma experienced by Crenshaw on January 6, 1979, it also furnishes a basis for concluding that Crenshaw's attending physicians and surgeons may have performed an unnecessary amputation. In any event, for present purposes this merely furnished a basis for cross-examination of Dr. McParland and for argument to the jury that respecting Crenshaw's underlying policy claim, Dr. McParland's opinion should not be credited. Such evidence in no way undercuts the power of Dr. McParland's opinion to furnish Bankers Life with an arguable reason for its refusal to pay Crenshaw's claim.
The point is this. When Dr. McParland testified at trial, he had reviewed all of the medical records. His opinion remained what he had stated before: that the amputation was caused by the preexisting arteriosclerotic condition in Crenshaw's right foot. There is nothing in the fact of trauma, whether that consists of Crenshaw's dropping an alternator on his big toe or the variations thereof in the records recited above, which is necessarily inconsistent with what Dr. McParland stated. For this reason it is likewise of no great significance that these records were not furnished to Dr. McParland ab initio. While it would obviously be the better practice to furnish the physician who has to give an opinion in such matters all medical reports, one cannot on these facts say that this failure had anything to do with the opinion Dr. McParland originally reached or subsequently delivered by trial. What we have in a nutshell is an arguably sloppy practice which is of no practical or legal consequence here.

E. The Majority's "Discrediting" Of Dr. McParland Is Rank Advocacy
Of all of the errors in the majority opinion, the most egregious is that found at pages 274-276. It is here that the majority seeks to discredit Dr. McParland as an expert witness on behalf of Bankers Life. Various tactics are used. That Dr. McParland is a salaried employee of Bankers Life who derives approximately twenty percent of his income from work for Bankers Life is somehow seen as pernicious.[10] The majority goes on to cite the opinion of the other two doctors in the case as well as several medical texts to show that Dr. McParland was wrong. What becomes quickly apparent is that the majority opinion is a combination of a cross-examination of Dr. McParland and jury argument to the effect that the good doctor's opinion should not be credited. That such advocacy is inappropriate requires neither explanation nor citation of authority.
I have read pages 274-276 repeatedly searching for a suggestion, first, that Dr. McParland should never have been allowed to testify or, second, that after he testified his testimony should have been excluded or, ultimately, that Dr. McParland's testimony was so incredible that notwithstanding same Crenshaw was entitled to a peremptory instruction in his favor on the underlying contract claim. None of these suggestions are made. Absent such, the majority opinion discredits itself.
The majority's opinion treats as somehow significant that McParland was a paid part-time employee of Bankers Life, deriving approximately twenty percent of his income from services rendered to Bankers Life. This was and is a legitimate topic for cross-examination, for it may be said to go to the witness' credibility. How the point is relevant on this appeal, however, escapes me. Suppose Dr. McParland had been situated the same but only ten percent of his *290 income came from Bankers Life? Only five percent of his income? Only one percent of his income? Would we still find such evil in this arrangement?
Suppose on the other hand that Dr. McParland were not a salaried employee but rather functioned according to the classical arrangement labeled independent contractor? The majority seems to imply that this would make a difference. But suppose that Dr. McParland's work as an independent contractor in fact resulted in twenty percent or more of his income being derived from services rendered to Bankers Life. It is with our judicial knowledge that many physicians perform medical services for various business, commercial and industrial concerns on an independent contract basis. These physicians frequently are called to testify in a variety of types of proceedings. I have never heard of anyone suggesting that this Court should castigate the credibility of such a witness because of his relationship to the defendant company.
And I might add that it is within our knowledge that there are a number of physicians who testify regularly on behalf of injured persons who are plaintiffs in civil actions or claimants in workers' compensation proceedings. This too is and has always been recognized as a legitimate subject for cross-examination. Still I have never heard of a court castigating the credibility of any such plaintiff's physician. What the majority is doing in pages 274-276 is unprecedented in our jurisprudence. The undisguised advocacy there found and the absence of any citation to law or logic supporting such an approach to a party's expert witness should be sufficient to establish the error of the majority's approach.

F. Reliance Upon A Credible Medical Opinion Obtained In Good Faith As A Matter Of Law Furnishes An Insurer An Arguable Reason For Denial Of A Claim
Remembering that our core question is whether Bankers Life had an arguable reason for refusal to pay Crenshaw's claim, the majority's dispatch of Bankers Life's reliance upon Dr. McParland's opinion is further troublesome. I would have thought it a relatively uncontroversial proposition that, where the outcome determinative question is medical in nature, an insurer's reliance upon a physician's opinion would as a matter of law furnish an arguable reason for denial of a claim. I would have thought this particularly so against the backdrop of our decisions in Blue Cross and Blue Shield of Mississippi, Inc. v. Campbell, 466 So.2d 833 (Miss. 1984) and Consolidated American Life Insurance Co. v. Toche, 410 So.2d 1303 (Miss. 1982).
In Blue Cross we held as a matter of law that an insurer had an arguable reason for refusal to pay a hospitalization claim where the insurer relied on the opinion of a registered nurse. In Consolidated American it does not appear that the claims adjuster who rejected the claim relied on an expert medical opinion at all, in the context of which Justice Bowling in dissent chides the company for its failure to consult or seek an opinion of its full time medical director. 410 So.2d at 1307. Here Bankers Life consulted its medical director and relied upon his opinion. This generally ought to be enough.
Peel v. American Fidelity Assurance Co., 680 F.2d 374 (5th Cir.1982) is quite important here. On analogous facts and applying Mississippi law, the Court of Appeals concluded
that the findings and report of Dr. Attix [a physician retained by the insurer] that Mrs. Peel was not disabled to return to ... [work] constitute an arguable defense as a matter of law. Hence, the trial court correctly refused to submit the issue of punitive damages to the jury.

680 F.2d at 376. [emphasis added]
The Peel case is cited prominently in Bankers Life's brief. The rule of law found in Peel  which is the Fifth Circuit's Erie-bound[11] *291 articulation of Mississippi law  strongly supports Bankers Life's position on this appeal. Inexplicably Peel is not mentioned by the majority (although the majority shows great affection for other Fifth Circuit bad faith refusal cases applying Mississippi law).
In this state and elsewhere the law is and ought to be that reliance upon the opinion of a qualified expert physician or surgeon should as a matter of law furnish an insurer an arguable reason for refusal to pay a claim.[12] To be sure there must be limits on such a rule, see Younan v. Equifax, Inc., 111 Cal. App.3d 498, 169 Cal. Rptr. 478, 487 (1980); Little v. Stuyvesant Life Insurance Co., 67 Cal. App.3d 451, 136 Cal. Rptr. 653, 659 (1977). Unless the Court holds that the medical expert was not qualified to give the opinion, or that his opinion was inadmissible because fraudulently rendered, the rule should hold. See Georgia Farm Bureau Mutual Insurance Company v. Troupe, 154 Ga. App. 108, 267 S.E.2d 834, 836 (1980); Hermitage Health and Life Insurance Co. v. Baggs, 115 Ga. App. 138, 154 S.E.2d 270, 273 (1967).
In the case at bar Bankers Life sought the opinion of a physician highly qualified in the field of vascular diseases and surgery. That opinion was that the sole cause of the amputation of Lloyd Crenshaw's right leg was its pre-existing arteriosclerotic condition. Bankers Life relied on this opinion. With respect, there is no dispassionate basis upon which one might say this was anything other than a bona fide opinion entitled to credit. In my view such a medical opinion as a matter of law furnished Bankers Life an arguable reason for refusal to pay Crenshaw's claim. To do otherwise requires that we set ourselves up as medical experts (which is precisely what the majority ultimately does). The potential for mischief in such an approach is to my mind great and obvious.

G. Bankers Life Never Relied On An Unenforceable Policy Provision Provision As A Basis For Its Denial Of Crenshaw's Claim

An additional red herring needs to be dispatched. The majority claims that the basis for Bankers Life's denial of Crenshaw's claim was its alleged literal reading of a clause in the policy we held in Peerless Insurance Co. v. Myers, 192 So.2d 437 (Miss. 1966) unenforceable literally. This language is in the form of a policy definition of the term "injury" as meaning
bodily injury causing the loss ... directly and independently of all other causes and effected solely through an accidental bodily injury to the insured person.
In Peerless we held that, notwithstanding such a clause,
recovery may be had where the accidental injury aggravates, renders active, or sets in motion a latent or dormant pre-existing physical condition or disease, which in turn contributes to the disability or death for which recovery is sought... .
192 So.2d at 439.
True, Bankers Life quoted the language of the clause in its claim denial letters of July 11, 1979, and April 8, 1980. Those letters coupled with the August 18, 1980 letter to Crenshaw's attorney make clear that Bankers Life is relying ultimately upon the medical opinion of Dr. McParland that the sole cause of the amputation was the preexisting arteriosclerosis. The majority obfuscates this feature of the claim denial letters and insists (at pages 270-271 and elsewhere) that Bankers Life was relying on the Peerless-invalidated definition of injury. I cannot find these facts in any of Bankers Life's claim denial letters or anywhere else in the record.
Having misfound the facts, the majority proceeds to find false comfort in the Fifth Circuit's decision in Richards v. Allstate Insurance Company, 693 F.2d 502 (5th *292 Cir.1982). In Richards, Allstate denied a claim on the basis of a policy exclusion which this Court had previously held unenforceable in Lowery v. State Farm Mutual Automobile Insurance Co., 285 So.2d 767 (Miss. 1973). Rashly, the majority says "This case is really worse than Allstate" (p. 271). With respect, I would suggest that examination of the Richards case and this case and a careful comparison of the two reveals the majority's analogy to be so much wishful thinking.
The basis for the superficial similarity between this case and Allstate is that Bankers Life refers in its denial letters to a definition of injury we held unenforceable in Peerless. What the majority overlooks is that the denial of this claim, both pre-trial and at trial, was not based on the unenforceable policy provision but was in fact made on the premise that the sole cause of the amputation was the preexisting arteriosclerotic condition in Crenshaw's right leg. I have been able to find nothing in the record to indicate that Bankers Life accepted the proposition that Crenshaw had sustained a trauma which aggravated the preexisting arteriosclerotic condition and then, ignoring Peerless, denied the claim by the literal invoking of the policy language.
Even if it may be said that Bankers Life ignored Peerless in the same sense that Allstate ignored Lowery v. State Farm, we have here a wholly independent basis for the denial of the claim  Dr. McParland's opinion that there was no cause of the amputation other than the preexisting arteriosclerotic changes. In Richards v. Allstate there was no other basis for denial of the claim other than the exclusionary clause invalidated in Lowery v. State Farm.

III. The Blue Cross Misconnection
The majority's treatment of our recent decision in Blue Cross and Blue Shield of Mississippi v. Campbell, 466 So.2d 833 (Miss. 1984) is troublesome on several fronts, one of which has been mentioned. The majority's primary reference to Blue Cross regards the matter of who decides whether "an arguable reason" exists, 466 So.2d at 842, the problem with which is that the premise stated refers neither to what the trial judge did in this case, nor what he should have done, and simply plays no discernable role in the overall structure of the majority opinion and its view of how bad faith refusal cases should be handled. Conversely, the majority completely ignores the principal passage from Blue Cross I would have thought relevant here  that ordinarily, where the insurer has a reason for denying a claim sufficient that it survives the plaintiff insured's motion for a directed verdict or peremptory instruction on the liability feature of the underlying contract claim, the insurer should thereupon become insulated from an award of punitive damages. Blue Cross, 466 So.2d at 842-43. Because of their importance, I will discuss these two points with some care.

A. Whether An Insurer Has An Arguable Reason For Failure To Pay With Reasonable Promptness Is A Question Of Ultimate Fact Determined By The Jury And Subject To The Rule Of Paymaster Oil  Although No Issue Here Turns On The Point

In Blue Cross the majority states
When the presentation of all evidence has been completed by both sides, it is the function and responsibility of the trial court to determine whether the insurance carrier has a reasonably arguable basis, either in fact or in law, to deny the claim.
466 So.2d at 842.
This proposition is repeated at page 269 of the majority opinion in the case at bar.[13] *293 Such repetition adds only to the authority of the proposition, not its logic.
Whether an insurer has an arguable reason for refusal to pay a claim is inherently and predominately a question of fact. The question is a matter of consequence on that day and in that case. It involves an inquiry which by and large will be of no concern or interest outside the context of the particular action. It is a "why did you act or fail to act" inquiry directed to one of the parties. It is even a question of fact when the insurer asserts a purely "legal" defense, for whether that legal defense is valid is subject to dispute and trial the same as any other fact question. See Blue Cross and Blue Shield of Mississippi v. Campbell, 466 So.2d 833, 854-55 (Miss. 1984) (Robertson, J., Concurring). I had thought this approach incorporated into our law by virtue of State Farm Fire & Casualty Co. v. Simpson, 477 So.2d 242, 250 (Miss. 1985), the ink with respect to which is not even dry.
All pure questions of fact and all questions having substantial factual components triable by a jury at common law may of right be subject to jury determinations in civil actions in this state. See City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983), construing Miss.Const. Art. 3, § 31 (1890). The raison d'etre of Paymaster Oil and progeny is to assure that the constitutional right to trial by jury remains secure.
Seen in this light it is the constitutional right of each litigant, if he so elects, to have a jury, not the trial judge, determine whether the insurance carrier has an arguable reason for refusal to pay a claim, an inquiry which will always be essentially one of fact even where the dispute is whether a legal defense may be recognized. The trial judge's authority in such matters is severely restricted and constitutionally so. Those limitations have been repeatedly articulated in Paymaster Oil and progeny, the most recent of which is State Farm Fire & Casualty Co. v. Simpson, supra, where we cited Paymaster Oil and held that
the question, whether an insurer has an arguable reason to deny the claim is to be passed upon... . under the same rules as are applicable in any other jury trial.
477 So.2d at 252.
The correct statement of the constitutionally mandated rule is that it is the primary function and responsibility of the jury, not the trial judge, to determine whether the insurance carrier has an arguable reason for refusal to pay a claim. The Blue Cross statement quoted here by the majority is thus seen wrong as matter of elementary legal reasoning. In the context of this case, this is just the beginning of the statement's inadequacies.
The record in the case at bar reflects that the trial judge did not "determine whether the insurance carrier has a reasonably arguable basis, either in fact or in law, to deny the claim" although he was requested to do so. The trial judge submitted the question to the jury.
As explained above  and respecting the teachings of Paymaster Oil  it is my view that the evidence is without contradiction that Bankers Life had an arguable reason for denial of the Crenshaw claim, and, that there was otherwise no jury issue on punitive damages. Assuming arguendo that I be wrong on the point, the arguable reason issue goes to the jury not the trial judge for decision. This is the rule the trial judge followed here, and I do not perceive the majority to reverse, thought fervently I would wish it to do so on other grounds.
I would submit that here and elsewhere I have demonstrated that determining the arguable reason issue (except with strict fidelity to Paymaster Oil) is not something trial judges do or ought to do in bad faith refusal cases. In the case at bar, the trial judge did not determine the arguable reason issue. The majority opinion certainly *294 doesn't reverse him for his refusal to do so. All of this gives me hope that the majority's fascination with this rationally unsound, legally invalid and practicably unused approach to determining the fact question of whether the insurer has an arguable reason for denial of a claim will soon pass.

B. Faithful Application of Blue Cross Requires Reversal Here  Or At Least A Candid Explanation Why Not

The majority's second sin regarding Blue Cross is one of omission. It is seen in the context of the trial judge's refusal to grant Crenshaw's request for a peremptory instruction on the liability feature of the underlying contract claim made at the close of all of the evidence. The effect of this ruling was a determination by the trial judge that reasonable minds could differ on the question of whether Crenshaw's pre-existing arteriosclerosis was the sole cause of the amputation of his leg.
In Blue Cross this Court said:
It can be argued with considerable persuasion that unless the trial judge grants a directed verdict to the insured plaintiff on the contract claim, then, as a matter of law, the insurance carrier has shown reasonably arguable basis to deny the claim; and, therefore, the carrier should never be subjected to the possibility of punitive damages based upon "bad faith."
There is compelling logic behind this argument and this would certainly appear to be true in the vast majority of cases. This criterion should ordinarily determine the answer to the question.
466 So.2d at 843.
We have applied this approach in State Farm Fire & Casualty Co. v. Simpson, 477 So.2d 242, 252 (Miss. 1985) to reverse a substantial punitive damages judgment against an insurer. This view, which I regard as sound and which (until today) I had thought firmly imbedded in our law, has great relevance here, for on this view, when the trial judge (correctly) refused the peremptory instruction in Crenshaw's favor on the liability phase of his contract claim, he necessarily pretermitted Crenshaw's claim for punitive damages.
To be sure, this approach does not fit every case, as I have explained elsewhere.[14] But when the Blue Cross majority states such a premise on April 10, 1985 and suggests that it will be found applicable "in the vast majority of cases", 466 So.2d at 843, and when the Blue Cross language is copied verbatim and given outcome determinative significance in State Farm on August 14, 1985, something more than silence is called for in the opinion of today's majority, particularly when this case seems so clearly one of that "vast majority" to which the Blue Cross/State Farm approach should apply. Yet the majority opinion here, however, doesn't even mention what I take to be one of the central premises of the Blue Cross majority opinion and the State Farm unanimous opinion.
Generally speaking, if the insurer has at trial denied liability on the policy  asserted lack of coverage, an affirmative defense, or whatever  and if the state of the evidence after all parties have rested is such that under our familiar rules the factual issue may not be taken from the jury, see, e.g., Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975), then the plaintiff insured is not entitled to a peremptory instruction on the underlying policy claim and as a matter of law the insurance company becomes insulated from a bad faith refusal claim.
If the evidence, to-wit: a conflict in medical opinions regarding the cause of the amputation, is such that a reasonable jury could find facts which would undergird a successful policy defense, the same evidence surely would justify a reasonable insurance company in so concluding, excepting only those cases where these is also a jury issue whether the medical opinion *295 is a sham or the product of fraud or "lying" (an exception not present here). Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), holds that:
If an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, ...
354 So.2d at 248.
An arguable reason is one in support of which there is some credible evidence. There may well be evidence to the contrary. A person is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he acts. And when we say this, we are in essence articulating in an extra-judicial context our familiar rules regarding what proof is necessary to create a jury question. See, e.g., Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
If there is a jury issue on the underlying policy question, that is, if the plaintiff insured is not entitled to a peremptory instruction on the liability feature of his underlying policy claim, then it follows generally that the insurance company has an arguable reason for failing to pay the claim.[15] This is the central teaching of Blue Cross, 466 So.2d at 843.
This approach is undergirded by and traceable to Veal where we stated
in our view of the case the plaintiff was entitled to a peremptory instruction directing the jury to find for him for the face amount of the policy, 354 So.2d at 248,
and only then affirmed an award of punitive damages. This is what I read Blue Cross as accepting as the approach to be applied "in the vast majority of cases", 466 So.2d at 843.
Without doubt the above formulation will not work in every case. Where the insurer's representatives lie or their defense is otherwise fraudulently conceived, the denial of the insured's request for a peremptory instruction on the liability claim should not preclude submission to the jury of the bad faith refusal claim. Blue Cross and Blue Shield of Mississippi v. Campbell, 466 So.2d 833, 852 (Miss. 1984) (Robertson, J., concurring). It may be that the majority here regards Bankers Life's defense as a lie or otherwise the product of fraud, and *296 if it does I wish it would forthrightly so state, for in that event only this case would be wrong. As the opinion now stands, and when it is compared with the portion of Blue Cross and State Farm here under discussion, the whole fabric of our law of bad faith refusal cases is seen rent with confusion and inconsistency.
For the reasons already explained, when this central thrust of Blue Cross and State Farm is applied to the case at bar, the judgment for punitive damages against Bankers Life can only be reversed and rendered. When the majority here doesn't even try to distinguish Blue Cross or State Farm or show how this case fits within some exception to the rule of those cases, but merely proceeds as though this central premise did not exist in our law, the injustice of our affirmance of the $1,600,000.00 punitive damages judgment becomes even more apparent.

IV. The Majority Affirms An Assessment Of Punitive Damages In This Bad Faith Refusal Case By Reference To A Standard Without Precedent In This State And Different From And Lesser Than The Standard Applicable In All Other Punitive Damages Cases
My final complaint is that the majority en route to affirmance has wholly departed from our general substantive rules regarding the assessment of punitive damages. Indeed, the majority has carved out bad faith refusal cases and held that in such cases punitive damages may be assessed upon a lesser showing than we require generally. I would hold that the substantive rule breach of which may subject a party to an assessment of punitive damages is the same in bad faith refusal cases as in any others.
The majority opinion, at pages 269-271 and particularly on page 271, appears to hold that punitive damages may be assessed solely upon a showing that the insurer denied the claim without an arguable reason therefor. All of our bad faith refusal cases  from Standard Life v. Veal forward  until today proceeded under the premise that punitive damages could not be assessed against an insurer unless there had been a violation of our general rule that proof of gross, reckless or maliciously intentional conduct must be shown. I read the majority as suggesting that denying a claim or defending a lawsuit without an arguable basis therefor will without more subject one to punitive damages.[16]
The confusion on this point  of which the majority here is by no means the first manifestation  appears to emanate from that most overworked sentence from Standard Life v. Veal, which in pertinent part reads:
Of course, if an insurance company has ... an arguable reason for failing to pay a claim, punitive damages will not lie, ... .
354 So.2d at 248.
This statement makes sense and has appropriately become the bedrock of much of our law in bad faith refusal cases.
The problem is that the converse is not necessarily so. That the presence of an arguable reason precludes assessment of punitive damages does not mean that the absence of an arguable reason requires their award. Yet this is precisely the trap into which the majority here  and no doubt others  have fallen, for the majority seems to proceed on the notion that all Crenshaw had to show to recover punitive damages was the absence of an arguable reason for Bankers Life's denial of his claim (see particularly page 271 of majority opinion).
I submit that more than the absence of an arguable reason must be shown before punitive damages are recoverable, much more, and that none of our cases prior to today holds to the contrary. The three bad faith refusal cases in which we have heretofore affirmed assessments of punitive damages all proceed under our general rule *297 regarding punitive damages, that such damages are assessable only where the insurer has been guilty of some wilful or malicious wrong or the gross or reckless disregard for the rights of others. Standard Life Insurance Company of Indiana v. Veal, 354 So.2d at 247; Travelers Indemnity Co. v. Wetherbee, 368 So.2d 829, 835 (Miss. 1979), and Reserve Life Insurance Company v. McGee, 444 So.2d 803, 808-09 (Miss. 1983). Where one or more of these labels may fairly be said to describe the conduct of the insurer, no doubt that insurer will have denied the claim without an arguable reason, but again the converse is not necessarily so.
The point is driven home by a recognition of the various circumstances in which, objectively speaking, an insurer may have no arguable reason for refusal to pay a claim but may nevertheless not be lawfully subject to an assessment of punitive damages. Where the failure to pay the claim is the result of "a clerical error or honest mistake", State Farm Fire & Casualty Co. v. Simpson, supra; Consolidated American Life Insurance Co. v. Toche, 410 So.2d 1303, 1306 (Miss. 1982), punitive damages do not lie though objectively speaking the insurer has no arguable reason for failure to honor a just claim. A failure to pay may result from negligence on the part of the insurer and punitive damages are not assessable, again assuming arguendo the objective absence of an arguable reason for such failuer to pay. State Farm Fire & Casualty Co. v. Simpson, supra; Bellefonte Insurance Co. v. Griffin, 358 So.2d 387, 391 (Miss. 1978). I doubt we would uphold an assessment of punitive damages where the insurer acted upon the erroneous advice of counsel, see Freeland, et fil., Bad Faith Litigation: A Practical Analysis, 53 Miss.L.J. 237, 250-56 (1983), again though the trier of fact has determined as a matter of fact that the insurer had no arguable reason for denial of the claim. We have only recently recognized that not every case of fraud is a case for punitive damages. Gardner v. Jones, 464 So.2d 1144, 1148 (Miss. 1985).
We have many cases arising in a variety of factual settings where we have purported to state the rule violation of which will subject one to assessment of punitive damages. See, e.g., Gardner v. Jones, 464 So.2d 1144, 1148-49 (Miss. 1985); Snowden v. Osborne, 269 So.2d 858, 860-61 (Miss. 1972); T.G. Blackwell Chevrolet Co. v. Eshee, 261 So.2d 481, 485 (Miss. 1972); Seals v. St. Regis Paper Co., 236 So.2d 388, 392 (Miss. 1970). These opinions are not remarkable for precision in thought or clarity in expression, although I doubt the rule could or should be stated in other than general terms. Out of our cases, nevertheless, there appear two somewhat distinct types of situations where one's conduct may subject him to punitive damages: where the defendant acted with malice and where the defendant acted with gross or reckless disregard for the rights of others. In this setting I would hope that some day soon we would embrace the rule found in Restatement (Second) of Torts § 908(2) (1979) to the effect that
Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.
I would hope further that this rule would be applied in all punitive damages cases, including bad faith refusal cases. At the very least I hope that at some future date we will return to the view that the rule for assessment of punitive damages is the same in bad faith refusal cases as in all others.

V. I Would Affirm Crenshaw's Judgment For $20,000.00 Contract Damages  And Add To That Prejudgment Interest, Reasonable Attorneys Fees and Legal Expenses
In the final analysis, I would reverse and render so much of the judgment below as assesses punitive damages against Bankers Life. Dr. McParland from the outset and at trial advised the company that the sole cause of the amputation was Crenshaw's pre-existing arteriosclerosis. Whatever else may be said of that opinion, it furnished Bankers Life with an arguable reason *298 for its refusal to pay. Dr. Westphal, Crenshaw's doctor, conceded that Dr. McParland's opinion could be correct, althought he (Dr. Westphal) did not think it was. With respect, I suggest there is no rational basis on which it may be said that Dr. McParland was lying or that his opinion was bogus, contrived, formulated in bad faith. It follows as a matter of law that, when the arguable reason question is viewed under Paymaster Oil rule, Bankers Life is entitled to judgment on Crenshaw's claim for punitive damages notwithstanding the verdict of the jury. Failure to prove that element of the bad faith claim causes the entire claim to fall. On this appeal we should reverse and render on the punitive damages issue.
On the other hand, I would affirm the judgment insofar as it awards $20,000.00 in policy benefits to Crenshaw and I would add to that pre-judgment interest and attorneys fees and legal expenses. I will explain.
As a part of the positive law of this state, I would have the Court declare that in any action brought by an insured against an insurance company in which the trial court enters judgment in favor of the insured and against the insurer for benefits afforded by a policy of insurance, the judgment shall have added to it
(a) pre-judgment interest at the legal rate beginning 30 days after the insured gave notice of his or her claim
(b) a reasonable attorney's fee not to exceed 25% of the amount of policy benefits recovered
(c) all legal expenses reasonably and necessarily incurred by the insured in the prosecution of the claim.

A. Reasonable And Necessary Attorneys Fees
On the award of attorneys fees, contrary to loose talk in some cases, this Court has long recognized the propriety of awarding attorneys fees absent statutory authorization. In the past we have approved awards of attorneys fees when the evidence was such that assessment of punitive damages was allowable, although no statute authorized such. See, e.g., Aetna Casualty and Surety Co. v. Steele, 373 So.2d 797, 801 (Miss. 1979); Kalmia Realty & Insurance Co. v. Hopkins, 163 Miss. 556, 566, 141 So. 903, 904 (1932); Yazoo & Mississippi Valley Railroad Co. v. Consumers' Ice & Power Co., 109 Miss. 43, 48, 67 So. 657, 658 (1915). This proposal would merely render less stringent the proof required of the plaintiff insured before attorneys fees could be recovered.
Shifting the burden of attorneys fees and legal expenses to the party adjudged at fault is a growing practice in litigation arising out of commercial or business transactions. The law requiring this emanates from two principal sources: statutory enactments[17] of the legislature and privately made law embodied in agreements between the parties.
In recent years the Mississippi Legislature has enacted a number of statutes authorizing recovery of legal fees and expenses in a business or commercial context. See, e.g., Miss. Code Ann. § 11-31-2(3)(c) (Supp. 1984) (attorneys fees recoverable against party who brings attachment in bad faith); § 11-53-81 (attorneys fees recoverable in suit on an open account); § 75-9-504(1)(a) (1972) (attorneys fees recoverable by secured party disposing of collateral after default); § 75-9-506 (1972) (attorneys fees must be paid to secured party if debtor redeems collateral); § 75-24-15(2) (Supp. 1984) (attorneys fees recoverable against violator of Consumer Protection chapter); § 75-71-717 (Supp. 1984) (attorneys fees recoverable by party who purchased illegal or fraudulent security); § 83-21-51 (1972) (attorneys fees recoverable against foreign insurance company for bad faith).
*299 The overwhelming majority of privately made agreements  contracts, leases, promissory notes, deeds of trust, security agreements, and the like  provide that the party guilty of breach shall be liable to the other for reasonable attorneys fees and legal expenses. We routinely enforce such agreements. See, e.g., Vinson v. McCarty, 413 So.2d 1026, 1032 (Miss. 1982) (attorneys fees clause in promissory note); Huey v. Port Gibson Bank, 390 So.2d 1005, 1007 (Miss. 1980) (same); O.J. Stanton & Co. v. Dennis, 360 So.2d 669, 672 (Miss. 1978) (attorneys fee clause in performance bond). The private commercial agreement which does not call for payment of attorneys fees upon breach has become the exception, not the rule, at least numerically speaking.
Little perceptiveness is required to discern the reason for this shifting of the burden of attorneys fees. Where this has been done by statute, the lawmakers invariably faced a situation either (a) where enforcement of important substantive rights by private action was being discouraged by imposing the cost of even successful litigation on the plaintiff or (b) where imposition of the reasonable costs (otherwise non-recoverable costs such as attorneys fees and legal expenses) upon a successful plaintiff would so substantially reduce a successful plaintiff's net recovery as to yield an apparent injustice, this particularly where the relative capacities to bear the burden of the expense of the litigation is generally so unequal.
Beyond this, it is within our actual and judicial knowledge that, where clauses providing that an unsuccessful defendant must pay reasonable attorneys fees and legal expenses have been made law privately by agreement of the parties, some of the same motivations may be found, principally that otherwise the cost of litigation will substantially reduce the successful plaintiff's net recovery. It should require little imagination to see that these same considerations are present when an insured such as Lloyd Crenshaw brings suit on a health and accident policy against an insurer such as Bankers Life.
In this context, the proposal made here would do nothing more than bring insurance claims litigation in line with the extant public policy of the state in business and commercial transactions, within which generic notions insurance contracts certainly lie.[18]

B. Pre-Judgment Interest
I would award pre-judgment interest on a similar approach.
Crenshaw's claim for benefits was submitted to Bankers Life on April 9, 1979. It has not been paid yet though, as we unanimously hold (and, indeed, as Bankers Life concedes), it has been authoritatively determined valid.
The insurer's duty in this regard is grounded in part in the insurance contract and in part in the positive law of the state. That duty is not merely to pay valid claims but to pay them promptly.
Little awareness of the realities of life is required to know that the failure of an insurer to pay promptly inflicts loss on the insured of at least three kinds. First, the insured has suffered a loss. He has incurred expenses which have to be paid, normally irrespective of whether or when an insurer pays. Thus the insured relatively speaking becomes strapped for cash while the insurer is processing the claim. Delayed payment may thus impose a great *300 burden upon the insured. Prompt payment may alleviate it.
Second, the use of one's money by another has value in economic theory and in fact. In a thousand contexts in our society this use is compensated by the charging of interest, such charges being imposed variously under the authority of public and privately made law. Changes made upon the use of one's money or forbearance to collect a debt are called interest. Mississippi Power & Light Co. v. Kusterer & Co., 156 Miss. 22, 34, 125 So. 429, 432 (1930); State Highway Commission v. Wunderlich, 194 Miss. 119, 122, 11 So.2d 437, 438 (1943). The economic value of an insurer's use of an insured's money, pending investigation and processing of a claim, is real and should be compensated via interest.
Third, the real economic value of the benefits due an insured decreases if payment is delayed because of inflation. The rate of inflation may be high or it may be low but it is seldom nothing. We have recognized the impact of inflation upon citizens, and its importance, in a variety of contexts. Adams v. Adams, 467 So.2d 211, 215 (Miss. 1985) (child support modification); Jesco, Inc. v. Shannon, 451 So.2d 694, 705 (Miss. 1984) (impact on damage award in personal injury case); First National Bank of Vicksburg v. Caruthers, 443 So.2d 861, 863 (Miss. 1983) (factor justifying enforceability of due on sales clause); Walters v. Inexco Oil Co., 440 So.2d 268, 275 (Miss. 1983) (impact of delay incident to appeal); Tedford v. Dempsey, 437 So.2d 410, 418 (Miss. 1983) (support agreement incident to irreconcilable differences divorce); Mississippi Public Service Commission v. Mississippi Power Co., 429 So.2d 883, 890 (Miss. 1983) (utility rate increase); Kinnard v. Martin, 223 So.2d 300, 302 (Miss. 1969).
In this context I would have this Court hold that, as a matter of law, prejudgment interest is payable on all insurance contracts, recognizing that even so the insured's losses as a result of delay in payment may only partially be compensated and that the insurer's temptation to delay in order to enjoy the value of the use of their collective insureds' money may only partially be deterred.
Although our cases have been restrictive, we have heretofore recognized the propriety of an award of prejudgment interest in the absence of statute where the evidence is sufficient to justify an award of punitive damages. Stanton & Associates, Inc. v. Bryant Construction Company, Inc., 464 So.2d 499, 502 (Miss. 1985); Dunnam v. State Farm Mutual Automobile Insurance Co., 366 So.2d 668, 672 (Miss. 1979), and in cases where the amount due is liquidated when the claim is originally made, Home Insurance Company v. Olmstead, 355 So.2d 310, 314 (Miss. 1978). I would hold that the circumstances discussed above regarding the losses suffered by the insured through delay in claims holding, and relative abilities to shoulder these losses of insurer versus insured coupled with the relative bargaining power of insurer versus insured requires that we recognize a lowered threshhold showing before prejudgment interest may be allowed.
We note that there has been in our sister states in recent years an increased recognition of the importance of awarding prejudgment interest in order to assure that the value of a plaintiff's recovery is not unfairly diluted. E.g., City of Portland v. Hoffman Construction Company, 286 Or. 789, 596 P.2d 1305, 1315 (1979); Bond v. City of Huntington, 276 S.E.2d 539, 546-50 (W. Va. 1981). This is particularly so where the claim sounds in contract and seeks compensation for damages sustained in the past. McIntosh v. Aetna Life Insurance Company, 268 A.2d 518, 521 (D.C. 1970); Restatement (Second), Contracts § 347(b) (1979).
The insurer, of course, is entitled to a reasonable period of time within which to investigate and process a claim. This is wholly consistent with the insurer's duty to pay with reasonable promptness. I would hold that prejudgment interest on all first party insurance claims should begin to run thirty days following the insurer's receipt of the proof of claim, unless the equities of *301 a given case clearly indicate that the commencement date should be later.

C. The Judgment The Court Should Order
Applying the foregoing principles to the case at bar, Crenshaw's judgment for $20,000.00 as policy benefits should be affirmed. In addition, I would hold him entitled to interest at the legal rate of eight percent from thirty days after he filed his claim with Bankers Life. This was some time in early 1979. Crenshaw would thus be entitled to at least $9,600.00 in interest (8% of $20,000.00 = $1,600.00 interest per year). In addition, Crenshaw would be entitled to recover his reasonable and necessary attorneys fees and his reasonable and necessary legal expenses, for the determination of which I would remand to the Circuit Court.
So much of the judgment below as awards to Lloyd Crenshaw and assesses against Bankers Life punitive damages in any amount I would reverse and render. To the extent that the Court today departs from this view, I respectfully dissent.
WALKER, P.J., and PRATHER, J., join in this opinion.
NOTES
[1] For the convenience of the reader, we have at times, in parenthesis, explained medical terms. We have also written out abbreviations except when the abbreviations, as they appear in the medical records can be clearly understood by the non-medical reader.
[2] The trial record spells the doctor's surname as "McParlin" while the Bankers Life records and briefs spell it "McParland". We will use the latter spelling.
[3] In this initial correspondence there was an obvious breakdown of information and communication. The question and answer of paragraph 3 of Crenshaw's proof of claim states:

"3. Describe fully how and where the accident occurred. (Answer) Removed alternator from wife car, and carried it to work bench. Removed armature from housing and was checking brg. on armature when housing rolled off bench and hit right foot."
Furthermore, on both the operation report signed by Drs. Westphal and Dale V. Hoekstra, orthopedic surgeon, and the pathologist's report the pre and operative diagnosis was "vascular insult, right foot." These reports were examined by Dr. McParland. The medical term "insult" means trauma. We will return to this perplexing failure to make further inquiry.
[4] Dr. McParland was correct in his conclusion that "anterior compartment syndrome" was not the correct diagnosis of Crenshaw's problem.
[5] The holdings in this case were reiterated in the recent case of Reserve Life Insurance Co. v. McGee, 444 So.2d 803 (Miss. 1983).
[6] Dr. McParland was quick to assert that at least ten doctors had seen Crenshaw, and none of them noted any trauma to his foot. Although this assertion is not supported by the record, the Court also notes that not one of these attending physicians reached the diagnosis Dr. McParland asserted. In fact, it is clear from the medical records and Dr. Westphal's testimony that Crenshaw's physicians were confronted with an injury to a foot that rapidly deteriorated up the leg, resulting in amputation. There is nothing in the medical records or Dr. Westphal's testimony to indicate that any of them considered the original problem to be an occlusion beginning around the knee.

These physicians were "on the scene," they examined Crenshaw, and Dr. McParland did not. Instead of interviewing these attending physicians, Bankers Life and Dr. McParland were content to deny the claim upon incomplete facts. In other words, they quit when they were ahead.
[7] Lemersal defended himself by testifying this was the policy language. When reminded this was contrary to Mississippi law, Lemersal replied Mississippi law had little, if any, bearing on whether the claim was "payable or deniable." (R. 612)
[8] Dr. McParland illustrated his medical opinion mentioning a log in a stream. Simple physics and hydraulics (if not the most rudimentary observation) also instruct us that, given the same pressure, a tube with its inner lining encrusted and with trash in it is more likely to stop up than it would if clear and clean.
[9] Well, not quite. The circuit judge, apparently detecting the omission by Dr. McParland of this observation made by Dr. Westphal in reaching his opinion, questioned Dr. McParland in chambers out of the presence of the jury. There the circuit judge noted Dr. Westphal had found blood pressure the day prior to surgery. Dr. McParland's first response was this finding was not in the medical records. The court then asked Dr. McParland was he saying Dr. Westphal found no pulse. Dr. McParland replied he was not saying Dr. Westphal found no flow, but if Crenshaw had had the kind of flow Dr. Westphal found, then he would not have required surgery. (R. 1029-1032)

This brings us full circle. Dr. McParland never saw Crenshaw. Dr. Westphal did. Unless Dr. Westphal was either mistaken or committed perjury, he detected a pulse. This was a fact Dr. Westphal personally observed (and not McParland's prerogative to deny), which sent up in smoke Dr. McParland's opinion there was no blood flow below the amputation site.
Did Dr. McParland then concede, in the face of an eyewitness account of blood flow, that he himself might be mistaken in his opinion that there was no flow below the site? No, he said, "If there had been that kind of flow, he would not require surgery."
Having repeatedly testified the blood flow ceased above the site of amputation, and this being his sole basis for concluding a problem above this area brought about the necessity of an amputation, when brought face-to-face with a testified fact to the contrary, did he abandon his opinion that he was possibly mistaken?
No, rather than having been mistaken in his opinion, he said if that had been true, there would have been no need for surgery. We can thus understand the circuit judge's intrigue with Dr. McParland's testimony.
[1] Noting a few examples, I have been in a decided minority in the following contentions: Wilson v. State, 395 So.2d 957, 961 (Miss. 1981), an accused should be entitled to a jury trial on whether he is a habitual offender; Parker v. State, 401 So.2d 1282, 1286 (Miss. 1981), an accused should never be deprived of having a jury decide his plea of self-defense; and Hill v. State, 432 So.2d 427, 452 (Miss. 1983), an accused in a capital murder case, and his jury, have a right to be told that regardless of the evidence, the jury has the power under our law to sentence him to life imprisonment rather than death.
[2] I am quite aware plaintiff's counsel spent many hours on this case, but I doubt if he put in any more than some members of this Court have.
[3] In Wagner v. Gibbs, 80 Miss. 53, 31 So. 434 (1902), in affirming a punitive damage award of $2,000 against a defendant who had given a minister of the gospel a first-class whipping, the Court noted the defendant was worth $200,000.
[4] The majority correctly recognizes our authority to direct a remittitur in a punitive damages award. Nothing in Miss. Code Ann. § 11-1-55 restricts that section to actual damages. Furthermore, there is common law authority in both trial and appellate courts, to avoid the expense and delay of a new trial, to direct a remittitur. In Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala. 1981), the Alabama Supreme Court remitted a $1,100,000 verdict to $100,000. See also A Moore's Federal Practice (2nd Ed.), § 59.08(7); Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935); cases cited under 25A C.J.S. Damages, § 201; Fact Concerts, Inc. v. City of Newport, 626 F.2d 1060 (1st Cir.1980); Gilbert v. St. Louis-San Francisco Railroad Co., 514 F.2d 1277, 1280-81 (5th Cir.1975); and Curtis Publishing, supra. Our only disagreement is in whether Miss. Code Ann. § 11-1-55 should be applied in this case.
[1] Dr. Nathaniel P. McParland of Chicago was the only medical witness who was a specialist in vascular surgery. He was the senior consulting surgeon at two hospitals. He was a member of the Board of American College of Surgeons, and had been a resident in vascular surgery at two hospitals in Illinois prior to entering into practice of general and vascular surgery in Chicago in 1960. His practice was predominately vascular.
[2] The implication of Dr. McParland's testimony, not even thinly disguised, is that, if immediately prior to January 6, 1979, Lloyd Crenshaw had sufficient blood flow (and hence pulse) in his lower right leg so that amputation was not imminent in the normal course, and if on January 6 Crenshaw experienced a trauma as he described at trial, and if ten days later his right leg was amputated six inches below the knee, then Crenshaw upon recovery from the amputation should have been investigating a likely claim for medical malpractice rather than suing Bankers Life for punitive damages. By this I do not wish to be understood as having concluded that the doctors who attended Crenshaw were guilty of malpractice, only that the logical extension of Dr. McParland's argument seems to my mind to bolster the arguableness of Bankers Life's only expressed reason for denial of Crenshaw's claim.
[3] Dr. McParland's testimony is discussed in much greater detail at pages 267-268 of the majority opinion and that discussion need not be repeated here.
[4] In the context of the legal point on which this case turns, to-wit: the "arguable reason" point, I regard it as important that, speaking qualitatively and quantitatively, the training, experience and other credentials of Dr. Westphal were substantially less than those of Dr. McParland. Dr. Westphal had graduated from medical school as recently as 1976 and had "been involved in internship and residence in general surgery at Keesler Medical Center". At the time he testified, he was not a member of any medical society other than the Air Force Society for Clinical Surgeons. He was planning to take the written portion of his Board certification examination at the time he testified. He was the young, recently-graduated resident who did the amputation. Dr. Westphal had no experience in the sub-specialty of vascular diseases or vascular surgery.
[5] Dr. Westphal's testimony is summarized in full on pages 265-267 of the majority opinion and need not be repeated here.
[6] Dr. Hockaday's testimony is summarized at pages 264-265 of the majority opinion and need not be repeated here.
[7] The majority opinion makes much of the fact that this claim denial letter includes a definition of injury which we had held unenforceable in Peerless Insurance Co. v. Myers, 192 So.2d 437 (Miss. 1966). That the letter includes a reference to this definition is as true as it is irrelevant. The opinion furnished by Dr. McParland on June 19 was that the preexisting arteriosclerotic disease was the sole cause of the amputation. That opinion is paraphrased and summarized in the July 11, 1979 letter. There is nothing in either Dr. McParland's opinion or in the Herzau letter which indicates any view or understanding on the part of Bankers Life that any trauma in fact played any causal role leading to the amputation. Absent some indication in the letter that Bankers Life was of the view that the amputation was caused in combination by the arteriosclerotic changes and Crenshaw's dropping the alternator on his big toe, the reference to the Peerless rule is simply beside the point.
[8] Again this opinion makes reference to the definition of injury mentioned in the previous footnote. Importantly, again nothing in the April 8, 1980 letter suggests in any way, shape, form or fashion that Bankers Life believed that there had been a trauma and was ignoring it and the Peerless rule. Indeed, there is touch of an inconsistency here in the majority opinion in that it complains at numerous points that Dr. McParland was not furnished with medical reports which would have reflected the fact of trauma. If that be true, Dr. McParland's pre-suit opinion could not have been infected by knowledge of trauma and, since Bankers Life was relying wholly on Dr. McParland's opinion, the denial of the claim could not in any way be predicated upon a Peerless-proscribed discounting of the trauma.
[9] In this exchange Dr. McParland explained once more his opinion that Crenshaw's amputation was due solely to arteriosclerosis. He noted in the operation report found in the initial medical records (P.Ex. 7 at R. 558) that there was "little free bleeding" found through the major arteries to the foot at the time of the amputation. Dr. McParland recognized that with little blood flow through these arteries at the point of the amputation there must have been an occlusion present somewhere near the beginning of the lower leg. Consequently an injury which allegedly occluded an artery in the foot would have had no effect since there would have been for all purposes no blood flow there anyway.
[10] We cannot help noting the contrast between this case and our recent decision in Blue Cross & Blue Shield of Mississippi v. Campbell, 466 So.2d 833 (Miss. 1984). In Blue Cross, the insurer originally denied the claim in reliance upon the opinion of a registered nurse. The Court held that this was just fine. Here, however, Bankers Life retains a physician, one of substantial credentials in the field of vascular diseases and relies upon the medical opinion of that physician. Bankers Life we convict of bad faith. This is irrational.
[11] Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).
[12] The majority seems to accept this proposition at page 273 and then inexplicably refuses to adhere to it.
[13] The notion at issue may have been derived from Freeland, et fil., Bad Faith Litigation: A Practical Analysis, 53 Miss.L.J. 237, 262-70 (1983). In my view, whether an insurer has an arguable reason for its refusal to pay a claim with reasonable promptness is no more a question for the trial judge  as distinguished from the jury  than whether a particular course of conduct constitutes negligence. Both arguable reason and negligence inquiries involved questions of ultimate fact. Stated otherwise, each involves a mixed question of law and fact. Neither may be taken from the jury except with scrupulous regard for the strictures of Paymaster Oil and progeny.
[14] Blue Cross and Blue Shield of Mississippi, Inc. v. Campbell, 466 So.2d 833, 852 (Miss. 1984) (Robertson, J., Concurring).
[15] Courts in other jurisdictions have recognized that where there is a factual issue on the liability feature of the insured's policy claim, an award of punitive damages or a statutory penalty is not proper as a matter of law. The Supreme Court of Iowa discussed this point as follows:

The evidence adduced by defendants in support of their defense of misrepresentation clearly made plaintiff's contract claim `fairly debatable,' and trial court must have determined this was so when it denied plaintiff's motion for a directed verdict on that claim. Plaintiff thus failed as a matter of law to prove what the adopting jurisdictions consider an essential element of the first-party bad faith tort, i.e., the absence of a reasonable basis for denying contract benefits. Accordingly, the jury should not have been instructed on that tort, and plaintiff's claim for punitive damages should not have been submitted to the jury.
Higgins v. Blue Cross, 319 N.W.2d 232, 236 (Iowa 1982) (emphasis added). In Gulf Life Ins. Co. v. Wilson, 123 Ga. App. 631, 181 S.E.2d 914 (1971), the Court said:
Since there was a jury issue as to whether Mr. Wilson was mentally competent to execute the release, and a verdict was authorized for either plaintiff or defendant on that issue, it cannot be said that the defense of Gulf Life was frivolous or unfounded, that it did not have a reasonable ground for contesting the claim. No bad faith appears in making the defense, and the award of penalty and attorney's fees was unauthorized... . If the evidence authorized a verdict for the defendant, or to put it another way, if the verdict could have gone for either party it does not authorize a finding of bad faith. 181 S.E.2d at 916-17. (emphasis added, citations omitted).
See also National Savings Life Insurance Company v. Dutton, 419 So.2d 1357, 1362 (Ala. 1982); Welch v. Western Cas. & Sur. Co., 567 S.W.2d 743, 748 (Mo. App. 1978) and my concurring opinions in Reserve Life Insurance Company v. McGee, 444 So.2d 803, 814-19 (Miss. 1983) and Blue Cross and Blue Shield of Mississippi v. Campbell, 466 So.2d 833, 851-52 (Miss. 1984).
[16] If this is the rule, a lot of litigants and their lawyers are in big trouble. And what about the converse? If a plaintiff presses a claim without an arguable basis for believing it viable, is the plaintiff subject to an assessment of punitive damages?
[17] Because they are enactments of that branch of government most clearly charged with discerning and implementing the public policy of the state, statutes are an important though often neglected source of law. Williams, Statutes as Sources of Law Beyond Their Terms in Common-Law Cases, 50 Geo.W.L.Rev. 554 (1982).
[18] My view on this point represents a conscious refinement of the suggestion I made in my concurring opinion in Blue Cross, 466 So.2d at 847. Because of the relative economic strength of the litigants and the obvious financial impact on the insured of having to pay his own attorneys fees and legal expenses, I would hold as a rule of law that, if he prevails on his underlying contract claim, the insured without more becomes entitled to recover reasonable and necessary attorneys fees and legal expenses.

If he had established the two elements of the basic bad faith refusal claim, I would have allowed recovery for actual economic losses or mental anguish  for reasonably foreseeable tort damages generally. Blue Cross, 466 So.2d at 847. The point is not present in the case at bar, first, because (in my view) Crenshaw has not proved the absence of an arguable reason  an element of the basic bad faith refusal claim, and, second, because Crenshaw made no proof of tort damages.